Abdul–Shahid Farrakhan **MUHAMMAD, Darrell X. McKinney, Victor Santos, Curtis McDowell, Uriah Webb, Horace Betard, Lashango LeGrand, and Kenneth Hammonds, Plaintiffs,**

v.

**CITY OF NEW YORK DEPARTMENT OF CORRECTIONS, Anthony Schembri, Commissioner, City of New York Department of Correction; Allyn R. Sielaff, former Commissioner, City of New York Department of Correction; and Catherine M. Abate, former Commissioner, City of New York Department of Correction, Defendants.**

No. 91 Civ. 6333 (LAP).

United States District Court,
S.D. New York.

Oct. 17, 1995.

Gibson, Dunn & Crutcher by Mitchell A. Karlan, Mary P. Donlevy, Robin L. Baker,

Colleen D. Duffy, Robert E. Malchman, W. James Hall, New York City, for Plaintiffs.

Paul A. Crotty, Corporation Counsel for the City of New York by Martha A. Calhoun,

Chlarens Orsland, New York City, for Defendants.

## TABLE OF CONTENTS

PROCEDURAL BACKGROUND ........................................... 165
FINDINGS OF FACT ................................................. 167
 I. The Nation of Islam ........................................ 167
 II. Plaintiff Muhammad's Allegations ........................... 170
 III. Testimony of Imam Askia Muhammad ....................... 171
 IV. DOC Religious Accommodation Policy ...................... 173
 V. The Testimony of Imam Luqman ............................ 173
 VI. NOI Volunteers in DOC Facilities: The Testimony of Antonio McCloud .... 176
 VII. Testimony of Robert Daly and Robert Wangenstein Concerning DOC's Operations and Allocation of Resources ...................................... 177
 A. Overview of the relevant DOC Operations ...................... 177
 B. The Rationale of Generic Services ........................... 180
 C. Operations at the Brooklyn House of Detention ................ 181
 D. Analogous Procedures on Rikers Island ....................... 182
 E. Evidence Concerning the Number of NOI Inmates ............... 183
 F. Federal Bureau of Prisons' Religious Accommodations ......... 186
CONCLUSIONS OF LAW ............................................. 187
 I. The Religious Freedom Restoration Act ....................... 187
 A. Substantial Burden ...................................... 189
 1. Ministers .......................................... 189
 2. Congregate Services ................................ 190
 3. Literature ......................................... 192
 4. Holidays .......................................... 192
 5. Other ............................................. 192
 B. Compelling Interest and Least Restrictive Means ............. 193
 II. First Amendment Claims ................................... 195
 A. Free Exercise ........................................... 195
 B. Establishment Clause .................................... 197
 III. Equal Protection ........................................ 199
 IV. New York Law ............................................ 199
 A. State law ............................................... 199
 B. City Regulations ........................................ 201
 V. Qualified Immunity ....................................... 201
CONCLUSION ....................................................... 203

---

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

PRESKA, District Judge:

Plaintiff Abdul–Shahid Farrakhan Muhammad ("Muhammad") seeks (i) a declaratory judgment that defendants have unlawfully deprived him of his rights under the federal and state law to practice his religion, that of the Nation of Islam ("NOI"); (ii) a permanent injunction requiring the City of New York Department of Correction ("DOC") to take a variety of actions concerning the exercise of his religion in DOC facilities; (iii) compensatory damages; and (iv) costs and attorneys' fees. For the reasons stated below which largely relate to the unique characteristics of the DOC system, I find that plaintiff is not entitled to the relief he seeks.

### PROCEDURAL BACKGROUND

Plaintiff Muhammad commenced a *pro se* action, pursuant to 42 U.S.C. § 1983, alleging that DOC staff prevented him from freely exercising his religion as a member of the NOI. On or about June 17, 1993, I appointed Gibson, Dunn & Crutcher to represent

Muhammad. By an amended complaint dated February 18, 1994, joining as plaintiff Darrell X. McKinney and as defendants, along with DOC Staff (or the "City defendants"), the State of New York Department of Correctional Services ("DOCS") and Thomas Coughlin (collectively, the "State defendants"), plaintiffs alleged that DOC and DOCS had violated their rights to practice their religion under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*, the First Amendment to the Constitution of the United States and the Constitution and laws of the State of New York. By a second amended complaint dated July 8, 1994 (the "Second Amended Complaint"), plaintiffs sought a permanent injunction requiring defendants to take the following actions:

(i) to recognize the Nation of Islam faith as a religion within the meaning of defendants' policies and practices;

(ii) to make available to plaintiff class members free and adequate access to Nation of Islam ministers for spiritual guidance and support;

(iii) to make available to plaintiff class members free and adequate access to religious services conducted by a Nation of Islam minister or inmate follower of the Nation of Islam;

(iv) to promulgate directives recognizing the holy days of the members of the Nation of Islam and permitting daylight fasting on the holy days requiring it;

(v) to allow plaintiff class members to possess religious literature of the Nation of Islam that does not present a clear and present danger to the institution as determined by an impartial board employing specific criteria;

(vi) to refrain from any conduct that substantially burdens the right of members of the class to exercise their religion if

that conduct is not the least restrictive alternative of furthering a compelling state interest; and

(vii) to refrain from making any distinction among religions based on defendants' assessment of the content of the tenets of any religion.

(Second Am.Compl. at 17.) Plaintiffs also sought compensatory damages, attorneys' fees and certification of a class of followers of NOI who are or will be incarcerated in the City and State correctional systems.

In response to plaintiffs' application to move to certify a class, the State and City defendants stipulated that any injunctive relief awarded to the individual plaintiffs would be implemented on a system-wide basis, thus obviating the need to litigate the class certification issue.

On or about July 25, 1994, the City and State defendants filed a motion to dismiss the RFRA claims on the ground that RFRA is unconstitutional. The State defendants, but not the City defendants, subsequently withdrew their constitutional challenge. The City defendants' motion is still pending before the Court.[1]

On November 8, 1994, the parties entered into a stipulation permitting six additional plaintiffs to intervene in the action.

A bench trial was conducted on December 8, 9, 12 and 13, 1994, and January 17, 18 and 30, 1995. Numerous witnesses testified, including the plaintiffs, all of whom are NOI followers; Robert Green, an NOI minister known as "Minister 9X"; four orthodox Muslim imams,[2] two of whom formerly belonged to the NOI and all of whom are employed by either DOCS or DOC;[3] one professor, Dr. C. Eric Lincoln ("Professor Lincoln"), who has written extensively about NOI for over thirty years; and Antonio McCloud, DOC's Di-

---

1. As explained *infra*, the City defendants' conduct is not prohibited by RFRA. Accordingly, I do not address the constitutional challenge.

2. "Imam" is a Muslim religious title equivalent to "Rabbi" or "Reverend". (Trial Transcript ("Tr.") 504, 691.) "Imam" means "the leader of prayer." (Tr. 504.)

3. The imams who testified are Imam Warithu-Deen Umar, Imam Sabur Abdur Salaam, Imam Askia Muhammad and Imam Abdush Shahid Luqman.

Imam Umar, a chaplain with the Albany County Jail and a ministerial program coordinator for DOCS, was a member of the NOI. (Tr. 502–03.) Imam Askia Muhammad, a DOC chaplain, is also a former NOI member. (Tr. 667–68, 675.)

rector of Volunteer Services, who frequently attends NOI religious services in New York and New Jersey. In addition, on December 9, 1994, a site visit was conducted to the Anna M. Kross Center ("AMKC"), a DOC correctional facility on Rikers Island. During the trial, the plaintiffs and the State defendants reached a settlement, and I subsequently approved a consent decree. No settlement was reached between the plaintiffs and the City defendants. Of the eight plaintiffs, only Muhammad has asserted claims against the City defendants.[4]

## FINDINGS OF FACT

### I. *The Nation of Islam*

There are dozens of Islamic sects, each sharing certain fundamental tenets, but also having distinctive beliefs, practices and spiritual leaders. (Tr. 97–101, 555–57.) The prophet Muhammad is said to have predicted that there would ultimately be seventy-two Muslim sects. (Tr. 556.) Imam Umar testified that he could currently name twenty to twenty-six such Muslim sects, and Professor Lincoln testified to fourteen splinter groups that came out of the NOI alone. (Tr. 49–50, 101, 557.)[5]

Turning to the NOI in particular, the NOI was founded in 1930 by Fard Muhammad, also known as W.D. Farad or Fard. After Fard's unexplained disappearance in 1934, his assistant, Elijah Muhammad, assumed leadership of the movement until his death in 1975. (Pl.Ex. 55 at 12, 15–16, 267.) According to Professor Lincoln, NOI leaders developed a theology aimed specifically at addressing the unique situation and need of African–Americans, including perceived needs for dignity, economic security and security from the police. (Tr. 41–42, 53.) Only African–Americans were permitted to join the NOI and to attend NOI services.[6] NOI doctrine exhorted members to use religion to do something for themselves, thereby bettering their existence. (Tr. 42–43.)

After Elijah Muhammad's death in 1975, his son, Wallace Deen Muhammad, also called Warith Deen, was designated to succeed his father as the leader of the NOI. (Tr. 47; Pl.Ex. 55 at 263–64.) Over the next decade, Wallace Deen Muhammad led the NOI into orthodox Islam. (Tr. 49; Pl.Ex. 55 at 264–65.) However, some NOI followers dropped out of the movement, while others formed splinter groups. (Tr. 49–50; Pl.Ex. 55 at 267.) Professor Lincoln testified that fourteen such groups were formed after Elijah Muhammad's death. (Tr. 49–50, 101.) In 1977, Louis Farrakhan left Wallace Deen Muhammad's community and resurrected the original NOI as it had been under Elijah Muhammad. (Tr. 50–51; Pl.Ex. 55 at 268.) NOI currently has members throughout the country, and its principal mosque is headquartered in Chicago. There are several mosques in the New York City metropolitan area. (Tr. 850; Pl.Ex. 55 at 267.)

All NOI members are of African descent. (Tr. 218; Pl.Ex. 55 at 20.) Most NOI followers convert during adulthood to NOI from the faith, often Christianity, followed in their childhood homes. (Pl.Ex. 55 at 25–26.) Many of the men who convert to NOI, including some of the plaintiffs, do so while incarcerated. (Tr. 74, 148, 255, 847, 849.) One reason why the prisons are a rich source of recruits for the NOI is that prisoners are among the most disaffected members of society. (Tr. 74–75.) There is frequently a racial component to this disaffection; that is, some black prisoners feel that they are the victims of a world controlled by whites. (Tr. 75.) In addition, prisoners also have considerable amounts of time to reflect on their lives. (Tr. 75.) Because many of the men

---

**4.** Although plaintiff Muhammad is the only plaintiff who has asserted claims against the City, general reference is made to "plaintiffs." Where reference is intended specifically to plaintiff Muhammad, reference is made to "plaintiff" or "plaintiff Muhammad."

**5.** By way of comparison, while Protestant sects share the Bible, they also have traditions and supporting literature that are distinctive. (Tr. 101–02.) Individual sects have their own spiritual leaders, and members of one Protestant sect would not normally attend the services of another sect. (Tr. 102.) Similarly, there are many different sects within Judaism that have different services and religious leaders. (Tr. 102–03.)

**6.** Professor Lincoln could not say whether attendance at services was still limited to African–Americans exclusively. (Tr. 60.)

who convert do so while incarcerated, the NOI has made efforts to be as active as possible in prison systems throughout the United States. (Pl.Ex. 55 at 77–78, 106–10; Tr. 849.) During the trial of the instant action, at least three witnesses—Imam Umar, Minister 9X and Antonio McCloud—testified about the NOI's activities in the prisons in the United States. (Tr. 503, 805, 808–09, 811, 816, 848–50, 874–76, 882–83.)

While members of the NOI have some distinctive beliefs and practices not shared by other Muslim groups, followers of the NOI and orthodox Muslims [7] share some common beliefs. For example, all Muslims, including members of the NOI, believe that Islam is based on the "five pillars", i.e., shahada (declaration of the faith), salat (prayer), zakat (charity), sawam (fasting), and hajj (pilgrimage to Mecca). (Tr. 93–94, 553–54.) Muslims throughout the world, including members of the NOI, affirm their faith in the shahada—"there is no God but Allah and Muhammad is the seal of the prophets"—and all Muslims believe Muhammad is the last "prophet." (Tr. 22, 33, 553–54.)

Unlike orthodox Muslims, NOI members believe that Allah came to the United States in 1930 in the person of Fard. (Tr. 32–33, 527, 688–89; Pl.Ex. 1 at 27–28, 145–46, Pl.Ex. 6 at 14.) They also believe that Fard is the great Mahdi, who is, according to Islamic tradition, the greatest teacher who comes at the end of time. (Tr. 32, 34, 52–53.) Also, unlike orthodox Muslims, NOI members believe that Elijah Muhammad is the "messenger of God." (Tr. 33, 53.) NOI followers do not recognize "imams" as religious leaders; NOI clergymen are referred to as "ministers." (Tr. 151–52, 887.) Members of the NOI do not believe in life after death. (Pl. Ex. 1 at 31–32; Pl.Ex. 6 at 14.)

NOI followers also have a distinctive creation story. They believe that trillions of years ago, a great explosion separated the earth and the moon. Once the earth cooled, there was Allah, who was black, and a world populated only by black people. However, the devil, "Yakub," along with twenty-four

mad scientists, conducted a series of genetic experiments on the Island of Patmos. Over time, they produced non-black genes from which the different races resulted—brown, red, yellow and white—each progressively less pure and less black. (Tr. 39–40; Pl.Ex. 1 at 28, Pl.Ex. 55 at 71–73.) Professor Lincoln has called this belief "the central myth of the Black Muslim movement." (Pl.Ex. 55 at 72.) Followers of the NOI believe that all blacks are divine and thus have a special relationship with Allah; they believe whites are ungodly and devils by nature. (Tr. 556; Pl.Ex. 55 at 63, 69–72, 104.) Followers of the NOI also believe that black people in America are part of the "lost and found nation." (Pl.Ex. 1 at 28; Pl.Ex. 55 at 71.)

Like all Muslims, members of the NOI follow the Holy Quran. (Tr. 23–24, 554; Pl. Ex. 55 at 118.) However, according to Professor Lincoln, the writings that are "critical" to NOI believers are those of their leaders, i.e., Elijah Muhammad and Louis Farrakhan. (Tr. 24, 76–77, 92.) The Final Call newspaper, the book Message to the Black Man in America by Elijah Muhammad and various study guides and lessons are among the publications read by followers of the NOI. (Tr. 77–78, 228–30, Pl.Ex. 55 at 124–29, 269.)

NOI members, like other Muslims, observe Ramadan. (Tr. 563–64.) NOI members also celebrate several holidays not observed by other Muslim sects. Among them are Savior's Day on February 26 (to honor Fard), Founder's Day on October 7 (to honor Elijah Muhammad) and a daylight fast similar to Ramadan during the month of December. (Tr. 33–35.) The December Fast was instituted in opposition to the Christmas holiday and to focus the attention of followers away from what Elijah Muhammad believed to be the temptations during December of irreligious excesses—in particular, Santa Claus, commercialization of the holiday and celebratory overeating. (Tr. 35–36.)

Followers of the NOI typically attend congregational meetings, including a religious service that is commonly held on Sundays; in addition, NOI temples hold frequent meet-

---

7. Among the "orthodox Muslim" religions are Sunni Muslims, Shiites, Ah–Mahidiyas, Sufi and

Alislam. (Tr. 97–98; Pl.Ex. 3 at 9.)

ings, and NOI members are required to attend two or more meetings a week. (Tr. 57–58, 291, 850–51; Pl.Ex. 55 at 18.) NOI services typically begin with a Muslim prayer, the introduction of some Arabic phrases and a short lecture by a minister-in-training. (Tr. 60–63.) The "main event" of an NOI service is the ceremony by the minister, which is basically a lecture on a theme such as the accomplishments and heritage of black people or black economic security. (Tr. 65–66.) The texts relied upon are often historical or anthropological. (Tr. 65–66; Pl.Ex. 55 at 113–14.) Professor Lincoln testified that the lectures are designed to foster self-esteem, empowerment and the members' reflection on their black identity. (Tr. 66.) At the end of the service, there is an opportunity for members of the audience to come forward and join the movement. (Tr. 68–69.)

Followers of the NOI follow a variety of restrictions in their day-to-day lives. For example, they are not to eat pork or cornbread, gamble, smoke, drink liquor, use drugs, overeat or buy on credit. They are taught to be clean-shaven and do not wear beards or moustaches. (Tr. 36, 150–51; Pl. Ex. 55 at 18, 76–77.) They are supposed to pray five times a day facing east. (Tr. 151.) They believe premarital and extramarital sex is immoral. (Tr. 36; Pl.Ex. 55 at 76.)

The evidence offered at trial concerning whether the NOI should be considered a "Muslim" religion and by whom it is so considered was varied. For example, certain of Professor Lincoln's writings suggest the NOI is a sect of Islam:

The Muslim dream is to have a solid Black Muslim community in the United States, recognized and supported by Moslems throughout the world as an accepted part of Islam. This is not sheer expediency: from the earliest days of the movement, the Black Muslims have considered themselves devout adherents of the Moslem faith. They recognize Allah as the one true God (though they see Him not as a unique deity but as the Supreme Black Man among Black Men, all of whom are divine). They base their services on both the Quran and the Bible, and they are learning Arabic so as to be able to rely

entirely on the original Quran. They observe the classic Moslem prayer ritual and dietary laws, and they hold in high esteem the traditional pilgrimage to Mecca.

(Pl.Ex. 55 at 220.) On the other hand, Professor Lincoln also has written that:

On certain fundamental points of doctrine, however, the Black Muslims have departed widely from the orthodox Muslim tradition. Partly for this reason, and partly from an instinctive militancy toward newcomers, the official representatives of orthodox Islam in the United States have refused any recognition of the Black Muslims.

(Pl.Ex. 55 at 220.) According to Professor Lincoln, two NOI doctrines are "at the heart of the controversy: their insistence that blacks must separate themselves from the abhorrent and doomed white race and their belief that it is the manifest destiny of the Black Nation to inherit the earth." (Pl.Ex. 55 at 221.) Professor Lincoln, noting "the orthodox Moslem ideal of an all-embracing unity of humankind", has questioned whether these two doctrinal differences are "so extreme that the Black Muslims must be said to have excluded themselves from Islam." (Pl.Ex. 55 at 221.) Professor Lincoln's conclusion was that the NOI appears to be a Muslim sect:

The question will have to be answered by Moslem theologians, but it seems likely that they will find the Black Muslims to be within the pale—a legitimate if somewhat heretical Moslem sect. Every faith has its deviates, and every international faith makes broad allowances for interpretations of doctrine to fit local conditions. The fact that orthodox Moslems in America reject the movement has no real significance; most Christian sects and denominations were likewise spurned by the orthodox in their founding years. And a clear precedent exists in Islam itself for the ultimate recognition of heretics in sects despite major doctrinal differences.

(Pl.Ex. 55 at 221.) Similarly, at trial, there was other evidence and testimony indicating that some orthodox Muslims might not consider followers of the NOI to be "Muslims" (e.g., Tr. 88, 157, 191, 473, 482, 546–47; Pl. Ex. 15), but there also was testimony indicat-

ing that NOI followers would be considered "Muslims." (*E.g.,* Tr. 88, 94, 686.) According to an article written by Imam Umar, an orthodox Muslim imam employed by the state DOCS, Louis Farrakhan, the current leader of the NOI, is not an orthodox Muslim, refuses to "accept the truth of the Holy Quran" and "teaches religious falsehood." (Pl.Ex. 60.) In this article, Imam Umar wrote:

> If [Louis Farrakhan] changes and accepts to evolve and draw closer to a genuine practice of Islam, as did his leader the Honorable Elijah Muhammad and those who followed him, he will have to accept Islam the religion, admit and condemn his past teaching of religious falsehood, become Muslim[,] indeed, become an Imam and conduct himself somewhat like Imam W. Deen Mohammed [a former leader of the Nation of Islam, who has since become an orthodox Muslim] has done, as a Muslim. If he does, the Nation of Islam will be no more.

(Pl.Ex. 60.) Imam Umar's article focuses on differences between the tenets of the NOI and mainstream Muslims, in particular the NOI's beliefs already described that the black man is God and the white man is the devil. (Pl.Ex. 60.)

II. *Plaintiff Muhammad's Allegations*

Plaintiff Muhammad joined the NOI in the mid–1980's, prior to his incarceration. (Tr. 287.) From 1989 to 1991, Muhammad was incarcerated in the Bronx House of Detention for Men and various jails on Rikers Island while awaiting trial. (Tr. 286.) Following his conviction, he was transferred to the custody of DOCS until his parole in January 1994. (Tr. 287.) Muhammad is currently a ministerial representative under the auspices of Minister Conrad Muhammad of Mosque No. 7 in Harlem, New York. (Tr. 289.)

While on Rikers Island, Muhammad maintained a cordial relationship with Imam Luq-

man, currently the DOC Director of Ministerial Services, and, at least initially, with most of the individual DOC Muslim chaplains, many of whom he knew personally prior to his incarceration. (Tr. 414–15.)

While on Rikers Island, Muhammad was permitted to wear attire that identified him as an NOI member, specifically, a suit, white shirt, bow tie and crescent pin.[8] (Tr. 415.) As a result, many inmates approached Muhammad with questions about NOI and Minister Louis Farrakhan. (Tr. 415–16.) Muhammad testified he was mindful of a DOC prescription against proselytizing,[9] had no dispute with the necessity for the regulation and thus discussed NOI matters in a neutral manner, "without, of course, causing any security ruckus." (Tr. 293, 415–16.)

Muhammad explained his role as a member of the NOI to educate prospective followers. He testified that:

> Our job is, as I said to you previously, we are like bait to fish. Fish that swim up against the stream or against the sea generally die, because they're going against the grain of their own nature.
>
> Eventually, when they smell food in the atmosphere, they go after food. We become the food. Or as the bible may put it, the bread of life. And they take part of that bread of life and they become living beings again or what you and I both know as the being reborn.

(Tr. 416–17.) In fact, Muhammad testified that he provided ample bait to the fish, recalling that he "fed" approximately ninety-five young black men at three Rikers Island facilities alone. (Tr. 417–18.) Muhammad did not receive an infraction from DOC staff for proselytizing. (Tr. 416.)

While at Rikers Island, Muhammad studied to become a ministerial representative. In the course of his studies, many "courtesies" were extended to him by DOC officers and officials, some of whom were themselves NOI members. (Tr. 419–20.) These offi-

---

**8.** Inmates who are awaiting trial while in DOC custody wear civilian clothes. (Tr. 644.)

**9.** Muhammad stated at his deposition, however, that he "recruited" several individuals while he was incarcerated at a facility on Rikers Island.

A few moments later, he clarified that by "several" he meant fifteen. (Declaration of Martha A. Calhoun in Opposition to Plaintiffs' Motion to Reopen the Record dated June 26, 1995 ("Calhoun Decl."), Ex. B. at 29–31.)

cers, including one captain, personally delivered study materials to Muhammad.[10] (Tr. 419–20.) Some material was sent to him by Minister Nelson Muhammad, who was then the minister of Temple No. 7. (Tr. 420.) Muhammad also met with Minister Nelson Muhammad in a personal visit at Rikers Island and spoke on the telephone with Minister Nelson Muhammad and Minister Louis Farrakhan while at Rikers Island. (Tr. 420–421.)

Although he was an NOI member, Muhammad never requested an opportunity to observe the December Fast while incarcerated in DOC facilities because, at that time, he had not acquired sufficient knowledge of its significance to his faith. (Tr. 320.) Muhammad attended the regular Friday service for Muslims and Muslim classes. (Tr. 670.) Although Muhammad testified to a dispute between him and some Muslim inmates who once barred his access to *Jumu'ah* service, he does not allege that DOC personnel prevented him from attending the Muslim service. (Tr. 425–27.) He believes Imam Askia Muhammad, a DOC Muslim chaplain, played some role in this incident. (Tr. 427.)

### III. *Testimony of Imam Askia Muhammad*

Imam Askia Muhammad ("Imam Askia") has been a chaplain for DOC for the past four and a half years. (Tr. 668.) He is currently assigned to the Queens House of Detention and the James A. Thomas Center ("JATC"), a correctional facility on Rikers Island. (Tr. 669.) At the Queens House of Detention, which houses some 500 inmates, approximately thirty inmates identify themselves as Muslim. At JATC, which houses some 1200 inmates, approximately 150 identify themselves as Muslim. (Tr. 669.) Imam Askia is currently unaware of any inmates, in either of these facilities, who identify themselves as members of the NOI (Tr. 669.) During the four and a half years Imam Askia

has been a DOC facility chaplain, he can recall only three inmates who were members of the Nation of Islam. (Tr. 677.)

Imam Askia was previously assigned to the George R. Vierno Center ("GRVC") on Rikers Island, where he knew one inmate who identified himself as a member of the NOI—plaintiff Muhammad. (Tr. 669.) Imam Askia and plaintiff had a friendly relationship. (Tr. 671.) Plaintiff regularly attended Imam Askia's Muslim classes which were typically held three times a week, as well as the weekly congregate prayer services. (Tr. 670.) In addition, Imam Askia and plaintiff had frequent private conversations in the Imam's office, in the mosque and in the hall. (Tr. 670.) They discussed a variety of topics, including conditions in the facility, food and religious matters. (Tr. 670–71.)

While DOC does not officially recognize the position of "Muslim inmate representative," it is the practice of Imam Askia to elect or select an inmate representative to assist him in order to create a sense of community among the Muslim inmates and to teach the inmates to accept leadership from one of their own. (Tr. 671–72.) Where Imam Askia believes that the inmates are mature and knowledgeable about the principles of Islam, he presides over a process in which the inmates elect their own representative. (Tr. 672–73.) Imam Askia always supervises the process to ensure that it is conducted in a peaceful and fair manner and does not compromise the security of the facility. (Tr. 673.) While plaintiff was incarcerated at GRVC, he was selected Muslim inmate representative in an election conducted without the knowledge, consent or supervision of Imam Askia. (Tr. 673.) Imam Askia and plaintiff subsequently discussed the election, and Imam Askia explained that he was troubled because the process had taken place in his absence. (Tr. 674.) Imam Askia also explained that he did not believe that plaintiff possessed the requisite qualities for in-

---

**10.** Muhammad testified in a conclusory manner that religious literature was taken away from him while he was in DOC custody. (Tr. 314.) However, he never gave any other information about the circumstances surrounding this incident. I do not credit that testimony in light of plaintiff's more detailed testimony that correc-

tion officers *brought* him NOI materials. In addition, I credit the testimony that NOI literature was given to inmates during workshops conducted in DOC facilities. (Tr. 810.) Even if such a confiscation occurred, it is contrary to DOC policy.

mate representative. (Tr. 674.) Imam Askia explained that while he considered plaintiff a "good brother" and that he loved him, he did not feel that plaintiff could establish the necessary rapport with inmates and the administration required of the inmate representative. (Tr. 674.)

There was differing testimony concerning whether the discussion concerning plaintiff's suitability to serve as the Muslim inmate representative touched on plaintiff's beliefs as a member of the NOI. (Tr. 674.) Plaintiff testified that Imam Askia asked him to repudiate his beliefs, became hostile and used derogatory language. (Tr. 317–18.) However, based on the testimony and demeanor of the witnesses, I find the testimony of Imam Askia to be credible. Imam Askia testified that he did not ask plaintiff to abandon his beliefs as a member of the NOI. (Tr. 674.) I also find that Imam Askia did not raise his voice, jump out of his chair or use profanity in his discussion, as alleged by plaintiff. (Tr. 677–78.) Imam Askia noted that plaintiff was visibly disappointed that Imam Askia did not choose him as inmate representative. (Tr. 676.)

Contrary to plaintiff's suggestions, I find that Imam Askia was not hostile or suspicious of the NOI. For most of his early life, Imam Askia was a member of the NOI. (Tr. 675.) When he was sixteen years old, his parents followed Imam W.D. Muhammad, the son of Elijah Muhammad, in a transition made by a large number of members of the NOI to what is commonly called orthodox Islam. (Tr. 675.) Imam Askia made this transition with his parents. (Tr. 675.)

Imam Askia frequently discusses his background and experiences with inmates as a way of encouraging them to get out of jail and to improve their lives. (Tr. 675–76.) In particular, he has discussed his experiences in the NOI with the plaintiff. (Tr. 675.) These discussions with the plaintiff focused on the benefits Imam Askia felt he had received from his upbringing in the NOI, such as discipline and a sense of responsibility. (Tr. 676.)

After he was told that he would not be chosen to serve as Muslim inmate representative, plaintiff made a request to Imam As-kia for separate Muslim services. (Tr. 678, 679, 681.) Imam Askia responded to his request by asking why, if plaintiff considered himself a Muslim, he wanted separate Muslim services and what specific needs were not being met by the Muslim services already provided. (Tr. 679.) Plaintiff expressed his desire that certain topics—specifically, African–American self-reliance and African–American problems—be discussed more directly and forcefully. (Tr. 679.) Imam Askia recalled telling plaintiff that he believed these topics were already being addressed but could incorporate them to a greater degree into the classes already being offered. (Tr. 679–80.) Plaintiff apparently did not follow up on this response. (Tr. 682.)

Plaintiff testified that he was prevented from attending congregate services by a group of inmates assigned to ensure the security of the facility Mosque. (Tr. 319.) However, I find the testimony of Imam Askia to be credible. First, Imam Askia testified that plaintiff attended his Muslim services "regularly." (Tr. 670.) Second, Imam Askia testified that, just as there is a correction officer present to provide security for every inmate group activity, correction officers, and *only* corrections officers, are assigned to provide security for all religious services, such as *Jumu'ah* prayer or classes. (Tr. 677.) Imam Askia also testified that inmates do not have the authority to prevent another inmate from attending religious services. (Tr. 677.) If an inmate, for whatever reason, would have to be excluded from religious services, it would be the responsibility of the chaplain, not the inmates, to deal with the matter. (Tr. 678.) In his four and a half years as a facility chaplain, Imam Askia has never prevented any inmate from attending religious services, including the plaintiff. (Tr. 678.) Imam Askia never "directed" that plaintiff be prevented from attending services. (Tr. 678.)

Contrary to plaintiff's allegation, Imam Askia does not find NOI beliefs to be offensive. (Tr. 680.) Imam Askia is well acquainted with Minister Louis Farrakhan and agrees with many of his teachings. (Tr. 687–88.) In addition, as a chaplain in a jail, Imam Askia expects to encounter inmates with

many different views about religion, including Islam. (Tr. 678–79.) Imam Askia testified that, "My basic function is to deal with differences and if I were to get offended I don't think that I could do that job successfully." (Tr. 680.)

## IV. *DOC Religious Accommodation Policy*

The DOC religious accommodation policy is set forth in Directive 3252, "Congregate Religious Services." (Pl.Ex. 30.) This directive is based on section 8 of the New York City Board of Correction Minimum Standards (Pl.Ex. 58), as well as underlying federal consent decrees. (Tr. 744–46, 752.) Among its provisions, Directive 3252 provides as follows:

All inmates shall be permitted to congregate for the purpose of religious worship including, religious instruction such as, scriptural study, and shall also be permitted to congregate for the purpose of participating in spiritual retreats.

(Pl.Ex. 30 at III.B.)

Inmates shall have the unrestricted right to hold any religious belief and to be a member of any religious group or organization, as well as the right to disaffiliate with any religious group or organization.

(Pl.Ex. 30 at III.C.)

Inmates shall be permitted to exercise their religious beliefs in any manner, provided that the exercising of such religious beliefs does not present a clear and present danger to the safety and security of the institution or would disrupt the orderly administration of the institution.

(Pl.Ex. 30 at III.D.) In addition, Directive 3252 permits inmates to celebrate recognized religious holidays on an individual or congregate basis, observe dietary laws and to wear and possess religious articles and clothing. (Pl.Ex. 30 at III.G–H.) All persons, including inmates, are forbidden to proselytize, to compel an inmate to become part of a religious organization or to dissuade an inmate from exercising his religious beliefs. (Pl.Ex. 30 at III.E.) Under Board of Correction Minimum Standards, members of the NOI are entitled to receive, without restriction, publications from any source, including family, friends and publishers. (Pl.Ex. 58, Title 40, § 1–14(a).) Incoming publications may not be censored or delayed unless they contain specific instructions on the manufacture or use of dangerous weapons or explosives or plans for escape. (Pl.Ex. 58, Title 40, § 1–14(c)(3).)

## V. *The Testimony of Imam Luqman*

Imam Abdush Shahid Luqman ("Imam Luqman"), the DOC Director of Ministerial Services, testified about the DOC religious accommodation policies and about his personal relationship with the plaintiff. As Director of Ministerial Services, Imam Luqman is responsible for the supervision and administration of the DOC religious programs. (Tr. 691–92; Pl.Ex. 31 at 1.) Prior to assuming his current position, Imam Luqman worked as a DOC chaplain in various correctional facilities and as a religious volunteer for fifteen years. (Tr. 692–93.)

DOC currently employs forty-four salaried chaplains, eleven of whom are Muslim.[11] (Tr. 774; Pl.Ex. 1 at 32.) The remaining chaplains are either Catholic, Protestant or Jewish. (Pl.Ex. 57.) Although none is currently an NOI member, at least one chaplain, Imam Askia, is a former member. (Tr. 675, 697.)

Chaplains are hired after their credentials have been screened by various ecclesiastical organizations, including the Board of Rabbis (for Jewish rabbis), the Archdiocese of Brooklyn (for Catholic clergy), the Council of Churches for the City of New York (for Protestant ministers) and the World Community of Islam (for Muslim imams). (Tr. 695; Pl.Ex. 31 at 1.) After their credentials have been confirmed by the ecclesiastical organizations, Imam Luqman and his staff interview candidates to determine their suitability for working in a jail setting. (Tr. 695–96.) DOC interviews any candidates sent to it, and would consider for employment an NOI candidate should one be approved by the ecclesiastical organization. (Tr. 697.)

Imam Luqman testified on cross-examination that a Protestant chaplain would provide services to all Protestants, even if the chap-

11. *But see* Pl.Ex. 57 (listing forty-five chaplains).

lain were himself a Baptist and the congregation included Episcopalians. (Tr. 725–26.) However, a Protestant chaplain would not provide services to Catholic inmates. (Tr. 726.)

DOC also utilizes the services of approximately 750–800 volunteers, seventy-five percent of whom are religious volunteers.[12] Approximately twenty to twenty-five percent of the religious volunteers are of the Muslim faith. (Tr. 698–99.) NOI members have been among this pool of volunteers, although they have not historically comprised a substantial percentage. (Tr. 699.)

DOC provides generic congregate religious services for the four major faith groups, i.e., Catholic, Jewish, Protestant and Muslim. (Tr. 699–700.) The purpose of generic services is twofold: (i) to reach effectively as many inmates as possible, in light of their large number and rapid turnover and (ii) to be tolerant and thus avoid offending members of other faiths, who may have somewhat different practices or nuances to their own form of worship. (Tr. 699–700.) Thus, for example, a generic Protestant service attempts to reflect the basic practices and beliefs of all Protestants, so that Episcopalian or Pentecostal inmates will be able to derive some benefit and solace from the generic service. (Tr. 699–700.)

In a typical generic Muslim service, a facility imam performs the ceremony, known as the "khutbah." (Tr. 700–01.) In the course of the khutbah, the imam may utilize the services of an outside religious volunteer or a member of the inmate population. (Tr. 701.) At the larger jails on Rikers Island, approximately 100–300 inmates may attend a Muslim service, with a lesser number attending at the borough correctional facilities. (Tr. 701–02.) The inmates who have attended these generic services have been members of various Muslim sects including the NOI, Sunni, Shiite, Ansarullah and Sikh. (Tr. 701.)

DOC also provides Quranic, Bible and Torah study classes. (Tr. 702–03.) In the Quranic class, a facility imam or a qualified inmate teaches the Quran to both new converts to Islam and more advanced students. (Tr. 703.) Recent converts learn the fundamentals of Islam, known as "mubadi," while advanced students study the Quran in more depth, as well as study Arabic. (Tr. 703) Attendance varies from five to seventy-five inmates, depending on the size of the facility and the season. (Tr. 703–04.)

Inmates may also meet with individual spiritual advisors of their choice in a "clergy/counsel visit." (Tr. 704.) At an inmate's request, the facility chaplain contacts the spiritual leader of a particular congregation or parish and arranges the necessary security clearances for the chosen spiritual advisor. (Tr. 704–05.) Also, clergy/counsel visits frequently are initiated in the first instance by spiritual advisors rather than by inmates. (Tr. 704–05.) These individual counsel visits are frequently utilized by inmates, and the number of visits is unlimited. (Tr. 705.) They are designed to accommodate specific or individual needs that cannot be provided on a group basis. (Tr. 714–17.)

Muslim inmates receive Halal meals while in DOC custody. (Tr. 705.) Upon their initial entry into the DOC system, they may register as members of the Muslim faith,[13] which allows them to receive Halal meals. (Tr. 705.)

DOC recognizes various religious holidays, including Ramadan. (Tr. 640, 705.) At the

---

**12.** Antonio McCloud, the DOC Director of Volunteer Services, estimated that there were 750 volunteers, of whom approximately sixty percent were religious volunteers. (Tr. 804–05.)

**13.** Entering inmates are given the opportunity to identify their religious affiliation. DOC's current compilations of the intake data identify forty percent of arriving inmates as Catholic, twenty-five percent as Muslim, ten percent as Protestant, three percent as Jewish, ten percent as "other" and ten percent as having no religion. (Tr. 758–60, 762–63, 774–75, 778–79.) These numbers are approximate because inmates tend to underrepresent themselves on arrival or change their religious affiliation after arrival. (Tr. 776.) Commissioner Robert Daly testified that he believed the percentage of Muslim inmates may be higher than twenty-five percent because thirty-five percent of inmates avail themselves of Halal meals. (Tr. 762.) Commissioner Daly also noted that five percent of inmates took kosher meals. (Tr. 762–63.) Commissioner Daly also testified that the number of Muslim inmates is increasing. (Tr. 774–75.)

beginning of each fiscal year, the Director of Ministerial Services reviews the proposed holidays and submits appropriate directives about holiday celebrations to pertinent DOC officials, including facility wardens, the DOC Deputy Commissioner of Strategic Planning and Programs and food services personnel. (Tr. 706.) In the event an inmate requests to celebrate a religious holiday not on the list of approved holidays, DOC attempts to accommodate that inmate in a spirit of tolerance, unusually through a clergy/counsel-type visit. (Tr. 706–08.)

DOC maintains a procedure that allows inmates to request religious accommodations. (Pl.Ex. 30;[14] Tr. 711.) This procedure was previously utilized by a group of approximately twenty-five inmates of Chinese descent, housed on a DOC prison barge. (Tr. 707–08, 711.) The group requested that a congregate religious service be conducted by a Buddhist monk. Imam Luqman, with the assistance of the DOC Jade Society, an Asian–American fraternal organization of civilian and uniformed staff, located a Buddhist monk to provide a Buddhist service on the prison barge for the group. (Tr. 707–08.) Aside from this request, no other *group* has requested a particular religious accommodation. (Tr. 708.) There have been requests made by *individual* inmates either directly or indirectly, *i.e.,* through other DOC employees to Imam Luqman. (Tr. 709.) For example, in response to individual requests, DOC has arranged for a minister of the Ansarullah community to visit a member of that sect and for a Greek Orthodox priest to visit with two Greek Orthodox inmates. (Tr. 709.)

Imam Luqman also testified about his encounters with plaintiff Muhammad. Imam Luqman's relationship with plaintiff was a cordial one, both before and after plaintiff's conversion to the NOI. (Tr. 712–13.) Originally a Sunni Muslim, plaintiff attended several congregate Muslim services conducted by Imam Luqman and sought individual counselling from the Imam on several occasions. (Tr. 712–13.) Following his conversion to the NOI, plaintiff attended a religious ceremony conducted by Imam Luqman at the GRVC on Rikers Island. (Tr. 713.)

In the course of his twenty-year career with DOC, Imam Luqman has made the acquaintance of perhaps ten inmates who identified themselves as NOI members. (Tr. 713–14.) Plaintiff was the only member of that group who made particular requests for a religious accommodation, albeit in an indirect manner. (Tr. 714–15). Although Imam Luqman understood plaintiff to have requested a collective December Fast (Tr. 714–15), he is apparently mistaken, as plaintiff himself testified that he never made such a request. (*Cf.* Tr. 320.) Imam Luqman may have construed the complaint or amended complaints in this action to constitute the purported "request"—as well as a purported request for an NOI minister to teach a class, which plaintiff himself did not testify he requested.[15] In any event, Imam Luqman testified that DOC attempts to accommodate individual requests on an individual basis, typically through a clergy/counsel visit. Imam Luqman testified repeatedly that an inmate's individual request, such as one for a December Fast, would be considered.[16] (Tr. 729, 732–33.)

As an example of DOC's willingness to accommodate individual religious requests, Imam Luqman noted that one of DOC's current inmates is a well-known Lubavitch rabbi

14. Directive 3252 states in part that:

Inmates may request to exercise the beliefs and practices of a religious group not previously recognized by the Department [of Correction]. The request shall be submitted in writing, to the head of the institution, through the Deputy Warden for Programs.

(Pl.Ex. 30 at IV.A.) Directive 3252 also sets forth the various steps to be followed and the criteria to be considered. (*Id.*)

15. Plaintiff testified that he asked for religious services to be conducted for members of the NOI. He did not say he asked for classes. (Tr. 314–15.)

16. For example, Imam Luqman testified as follows:

Q. [W]as Mr. Muhammad accommodated for the December fast by providing him meals at any special times?

A. I'm saying that we are tolerant and that we can do that. The specifics of the situation with Mr. Muhammad I'm not fully aware of. (Tr. 729.)

held at the facility known as North Infirmary Command ("NIC"). (Tr. 715–16.) Because the kosher food provided by DOC apparently did not meet that sect's standard, Imam Luqman's office arranged for members of the rabbi's Lubavitch community to be permitted to bring appropriate food directly to the jail for the rabbi. (Tr. 715–16, 729–31.)

According to Imam Luqman, the distinction between the request of the Chinese Buddhists (which was granted) and what Imam Luqman understood plaintiff to be seeking, was twofold: (i) there was no underlying generic congregate service available for Buddhist inmates in the first instance, as opposed to an NOI inmate, who can derive at least some benefit and solace from a generic Muslim service and (ii) plaintiff was an individual whom Imam Luqman believed was acting on his own behalf in seeking apparently collective accommodations—as opposed to representing an actual group—and honoring the request thus would be an imposition of religious services on a group of inmates without their consent. (Tr. 716–17.)

Plaintiff alleged that he was denied a position as an inmate representative by a facility chaplain at GRVC, Imam Askia. (*See* Second Am. Compl. ¶¶ 40–42.) According to Imam Luqman, a facility chaplain may exercise his discretion and allow an inmate to assist him in the conducting of services. (Tr. 717–18.) A person who assists a Muslim chaplain (or assists a *sheykh* in a Muslim mosque) is known as a *"naib."* (Tr. 718.) The manner in which the person is chosen is determined by the individual chaplain, and the selection is within the chaplain's discretion. (Tr. 718–19.)

### VI. *NOI Volunteers in DOC Facilities: The Testimony of Antonio McCloud*

Antonio McCloud ("McCloud") has been Director of Volunteer Services of DOC since 1992. (Tr. 801.) As such, he acts as a liaison between DOC and the civilian community, soliciting volunteers to provide a variety of services to inmates in DOC facilities. (Tr. 804.) The mission of the volunteer program is to solicit and use community volunteers to assist in providing inmate services and to help inmates make the transition back to the community. (Tr. 804.)

Volunteers provide a number of important services, including counseling, literacy assistance, law library assistance, general library assistance, drug and alcohol counseling, self-development and empowerment workshops, job readiness training, AIDS education, case management and, in the nursery at the women's facility, child care aid. (Tr. 805.)

Although there was no testimony that McCloud was himself an NOI member, it is undoubtedly fair to say that McCloud has been involved in a number of NOI activities. For example, he has visited NOI mosques in Harlem and New Jersey approximately four times a year for the past fifteen years. (Tr. 811.) In addition, McCloud has participated in self-development training conducted by NOI's paramilitary arm, the Fruit of Islam ("FOI"), prior to his employment with DOC. (Tr. 812.)

NOI volunteers serve the DOC inmate population in two capacities, *i.e.*, as guest speakers and by conducting personal development workshops. (Tr. 806, 810.) For example, Minister Conrad Muhammad, a prominent NOI figure, has spoken at two Rikers Island facilities: the George Mochen Detention Center ("GMDC") and the Otis Bantum Correction Center ("OBCC"). (Tr. 811.)

NOI volunteers, under the direction of Minister 9X, the NOI Director of Prison Ministries, have been conducting self-development workshops at GRVC on Rikers Island. (Tr. 806.) These workshops stress such themes as self-esteem, responsibility, respect and empowerment. (Tr. 806, 850.) The sessions are held once a week for two hours and are open to all inmates in the facility who wish to participate, regardless of religious affiliation. (Tr. 806–07.) Generally, twenty to thirty inmates attend each session. (Tr. 807.) The volunteers bring in written materials prepared for the workshop, as well as the publication, the *Final Call*, to utilize as part of the discussion. (Tr. 810.) The *Final Call* is left for the inmates to read after the workshop is over. (Tr. 810.)

DOC began to offer these workshops after Minister 9X approached McCloud about pro-

viding NOI volunteers to become involved in New York City jails. (Tr. 808.) McCloud was "very excited about the opportunity" to have NOI volunteers serving inmates in DOC facilities. (Tr. 808.) Their self-development program, he felt, had a proven track record of helping inmates make a successful transition back into civilian life. (Tr. 808–09.) Since assisting inmates in making a successful transition back to civilian life is a major focus of the Volunteer Services program, McCloud began to work with Minister 9X and other NOI members to set up a program of self-development workshops in a DOC facility. (Tr. 809.)

At the time of trial, these self-development workshops had not been offered for two months because of scheduling difficulties with NOI volunteers. (Tr. 807–08.) However, McCloud testified that he planned to resume the program by the end of January. (Tr. 808.) In addition, McCloud plans to expand the program to other facilities. (Tr. 807.) According to McCloud, if Minister 9X and his colleagues are unavailable, McCloud will look for someone else in the NOI community to provide these workshops. (Tr. 815.)

## VII. Testimony of Robert Daly and Robert Wangenstein Concerning DOC's Operations and Allocation of Resources

Robert Daly ("Daly") is the DOC First Deputy Commissioner and is responsible for the implementation of DOC policy. (Tr. 737.) He reports directly to the Commissioner. (Tr. 737.) Daly has held a variety of positions in his twenty-two-year career with DOC, including General Counsel and Special Counsel to the Commissioner. (Tr. 738.) Daly testified about the factors considered by DOC in allocating its resources and operating the correction system in New York City.

Robert Wangenstein ("Wangenstein") is the Warden of the Brooklyn House of Detention for Men. (Tr. 617.) In his twenty-three-year tenure with DOC, he has held a variety of positions, including DOC Deputy Commissioner of Security in the period 1990–1994. (Tr. 617–20.) Wangenstein testified about the logistical and security concerns inherent in the operation of DOC facilities, using the Brooklyn House of Detention as a representative facility.

### A. Overview of the relevant DOC operations

DOC presently operates sixteen jails, of which ten are located on Rikers Island and the remainder in the boroughs; three hospital prison wards; and seventeen holding facilities in the city courts, known as "court pens." (Tr. 621; Joint Pretrial Order, Ex. C ¶ 2.) About half of the DOC facilities provide cell block housing, with the other half providing dormitory housing. (Tr. 764.) These facilities hold inmates of various classifications, including detainees awaiting trial, City-sentenced inmates serving one year or less, State-sentenced inmates who are temporarily in the DOC system for a trial or appeal, State-sentenced inmates who have been paroled and have been rearrested on parole violations, Immigration and Naturalization inmates and, on occasion, federal inmates held by agreement or contract. (Tr. 622; Def.Ex. E).

At the time of trial, of the 19,000 inmates in DOC custody, about 3500 have been convicted of crimes and are serving sentences of one year or less in DOC custody. (Tr. 763, 780–81.) About 1600 inmates are paroled state inmates who have been rearrested on parole violations and are in DOC custody awaiting a hearing or remand to DOCS. (Tr. 783.) Approximately 200 inmates are sentenced inmates serving their sentences at state correctional facilities who are in temporary DOC custody for various other reasons, such as awaiting trial. (Tr. 782–83.) The balance and great majority, some 13,700 out of 19,000, are pre-trial detainees who are either being held without bail or have been unable to make bail. (Tr. 785.) In short, there are significantly more pre-trial detainees than there are sentenced inmates in DOC custody. (Def.Ex. E–4.)

Unlike DOCS, which holds sentenced inmates for set periods of time, DOC's system is primarily a detention system, where inmates are held to await trial, as described above. (Tr. 750.) The inmate turnover time is brief. In fiscal year 1994, 111,072 inmates

entered DOC custody. (Def.Ex. E–4.[17]) Although forty percent of these entering inmates remained in DOC custody after thirty days, forty-two percent were discharged from the system within a mere six days. (Def.Ex. E–4.) More than three-quarters of the entering inmates were discharged within sixty to eighty-nine days. (Def.Ex. E–4.)

DOC expects that 130,000 inmates will enter DOC custody this year. (Tr. 750.) Of that number, DOC expects fifty percent to leave the system in about six days and the other fifty percent to depart approximately 50 days later. (Tr. 750.)

On a typical day, 300–350 persons enter the DOC system, and approximately the same number are discharged. (Tr. 750.) On a typical day, approximately 2000 inmates are transported to the five boroughs for court appearances. (Tr. 751.) Many of those inmates do not return because they receive time-served sentences, have their cases dismissed or make bail. (Tr. 751.) About 100 sentenced inmates are transferred daily to DOCS custody, for a total of 500 transfers per week. (Tr. 751.) On a typical day, about 1200 inmates on Rikers Island are moved to different DOC facilities on Rikers Island pursuant to the ongoing process of classifying and reclassifying inmates based upon changes in their inmate profile. (Tr. 751.) For example, special housing may be required for medical reasons or where an inmate is deemed a suicide or escape risk. (Tr. 751.)

In sum, I find on essentially uncontroverted evidence that the DOC prison population is exceptionally dynamic; it suffers from a relatively high number of inmates as well as an exceedingly high inmate turnover rate. The dynamic nature of DOC's population distinguishes it from other systems as to which evidence was offered, making comparisons to those systems inapposite.

DOC's current operating budget for fiscal year 1995 is $746 million.[18] (Tr. 738, 767, 769.) The operating budget comprises staff salaries, overhead, food for inmates and the cost of services. DOC's capital budget for fiscal year 1995 is $45 million.[19] (Tr. 767–68.) The capital budget covers expenses such as the construction of new or additional jail space, adding new beds and fire safety. (Tr. 739.)

DOC has been reducing its operating budget. (Tr. 740.) Reductions are continuing into the immediate future; DOC, along with other City agencies, has been ordered to reduce its budget due to a $500 million gap in the City budget in the current fiscal year and the anticipated $2 billion gap in fiscal year 1996. (Tr. 740.) Specifically, at the time of trial, DOC had been directed to reduce its operations by $18 million by July 1, 1995, and by an additional $18 million six months after that. (Tr. 740, 764–65.)

Although DOC's budget has, of necessity, been reduced, its inmate population has been increasing. (Tr. 741.) At the time of trial, there were approximately 19,000 inmates in DOC custody. (Tr. 763.) Based upon the growth rate for the inmate population, DOC anticipates holding approximately 20,200 inmates in June 1995; 20,900 inmates by November 1995; and over 21,000 inmates by 1996. (Tr. 763.) In addition, in fiscal year

**17.** Defendants' exhibit E–4 states:

FY [Fiscal Year] '94 Discharges:

Average Length of Stay

| Days | Number Leaving | % Leaving | Cumulative % Leaving |
|---|---|---|---|
| 0–1 | 17,749 | 16.0% | 16% |
| 2 | 5,539 | 5.0% | 21% |
| 3 | 4,702 | 4.2% | 25% |
| 4 | 7,136 | 6.4% | 32% |
| 5 | 8,490 | 7.6% | 39% |
| 6 | 2,696 | 2.4% | 42% |
| 7 | 2,329 | 2.1% | 44% |
| 8–14 | 6,412 | 5.8% | 50% |
| 15–29 | 11,113 | 10.0% | 60% |
| 30–59 | 12,016 | 10.8% | 70% |
| 60–89 | 7,161 | 6.4% | 77% |
| 90–179 | 13,399 | 12.1% | 89% |
| 180+ | 12,330 | 11.1% | 100% |
| | 111,072 | | |

(Def.Ex. E–4.)

**18.** DOC's operating budget in fiscal year 1994 was $763 million; in 1993, $760 million; in 1992, $762 million. (Tr. 769.)

**19.** During cross-examination, Daly conceded that DOC's total budget, *i.e.*, the operating budget plus the capital budget, had increased from 1994 to 1995. (Tr. 770–71.) Daly explained that the increase in the capital budget was due to court-ordered projects. (Tr. 770–71.)

1994, approximately 110,000 inmates entered into DOC custody; by the end of fiscal year 1995, DOC anticipates its entering population to reach 130,000 inmates. (Tr. 741.)

Although the number of inmates is increasing, DOC has been forced to reduce its staff. For example, in calendar year 1994, 1600 additional inmates entered the system but during that same year, DOC lost 400 correction officers and 400 civilian workers. (Tr. 740.) At its high point, in 1992, DOC employed about 11,950 correction officers. (Tr. 743, 786.) The number was about 10,600 officers at the time of trial. (Tr. 786.)[20] In addition, DOC has not been able to hire any correction officers since December 1991, and so DOC has been forced to rely upon increasing amounts of overtime to operate its facilities, which strains the assigned staff. (Tr. 742.)

Furthermore, attrition has taken its toll on DOC, with 1200 additional people retiring or leaving voluntarily within the last three years. (Tr. 742.) Moreover, as a result of two recent City severance programs, 400 civilians out of a total civilian staff of 2100, have left DOC. (Tr. 742–43.) DOC also anticipates losing several hundred more civilians under the current City severance program. (Tr. 743.)

As a result of the loss of staff positions, DOC recently has been forced to close a number of correctional facilities including the Brooklyn Correctional Facility ("BCF" or the "Brig"), which formerly housed 1,350 inmates; the south wing of the Manhattan Detention Complex ("MDC" or "the Tombs"), which formerly housed 388 inmates; and a converted Staten Island ferry boat berthed at Rikers Island, which formerly housed 162 inmates. (Tr. 741–42.) Other correctional facilities closed in recent years due to budgetary concerns include the Forebell Facility, a sentenced women's facility in Brooklyn, and two prison barges. (Tr. 621–22.)

Another result of the staff cutbacks and budgetary concerns is the reduction or elimination of numerous inmate programs deemed valuable and successful by DOC. For example, a 900–bed drug program has been reduced to 200 beds. (Tr. 744.) All the correction officers assigned to the inmate grievance program have been reassigned. (Tr. 744.) DOC anticipates eliminating the inmate indoor recreation program by the end of January 1995 in order to utilize the 170 uniformed correction officers in other areas. (Tr. 744.) DOC also anticipates eliminating all its civilian counselors, who help inmates secure employment, housing and various social services, following their release from custody. (Tr. 748.)

DOC's overall aim has been to reduce discretionary programs, leaving only those programs required by consent decrees or the minimum standards of two independent oversight agencies, the New York City Board of Correction (see New York City Charter § 626) and the New York State Commission of Correction (see Correction Law, Article III, §§ 40–48). (Tr. 744–45; Pl.Ex. 58.) Currently, virtually all, if not all, of the inmate programs offered by DOC provide services required by consent decrees or the minimum standards. (Tr. 752.) These programs include recreation, law library, visits, religious services and educational programs. (Tr. 752; Pl.Ex. 58.)

However, mandated programs will be affected by the current downsizing. For example, as a result of a federal consent decree, inmates cannot be "locked-in" their cells or dormitory until 11:00 p.m., which allows them to congregate in housing area "day rooms." DOC plans to move to modify the consent decree to change the lock-in time to 9:00 p.m., thereby reducing the number of correction officers needed to monitor the congregating inmates and saving 350 correction officers' posts. (Tr. 749.)

Another factor DOC considers in allocating its resources is the likely effect on the inmate population. For example, a newspaper article about the proposed early lock-in time led to a hunger strike among inmates on Rikers Island. (Tr. 757.) This required DOC immediately to meet with members of the various Inmate Councils to educate them about the process that would have to be undertaken

---

**20.** By contrast, twenty-two years ago, when Daly first began his DOC employment, less than 3,000 officers supervised less than 8,000 inmates. (Tr. 743, 786, 795.)

before the change could be effected. (Tr. 757.)

Currently, the DOC programs budget comprises about 1.7% of the current operating budget ($12 million) and is expected to be reduced to slightly under 1% ($6 million). (Tr. 753.) Of this amount, the amount allocated for religious programs is $900,000 to $1 million, an amount that has been relatively stable for the past few years and which is not expected to change. (Tr. 753, 772–73.) This amount reflects a recent increase in which DOC upgraded several temporary chaplain positions to full-time permanent positions, in response to an increase in the inmate population. (Tr. 753, 773–74.) As stated *supra,* DOC currently employs forty-four chaplains and has no plans to reduce this number. (Tr. 773–4; Pl.Ex. 57.)

### B. *The Rationale of Generic Services*

In determining what programs will be preserved and what programs will be reduced or eliminated, DOC considers the security implications, the program's efficiency and its cost. (Tr. 758.) As a result, DOC has developed a policy of providing programs in a generic manner.[21] (Tr. 758.) For example, generic religious services allow DOC to service large numbers of inmates in a single space within a facility at a minimal cost. (Tr. 758–59.)

There are numerous factors that DOC cites in favor of its policy of generic services. Among them is the reality that space is at a premium in DOC facilities. DOC jails were built to house a far smaller inmate population than they currently do. (Tr. 759.) As the inmate population grew, DOC added housing areas to the core facilities but did not add concomitant program areas. For example, the Adolescent Reception and Detention Center on Rikers Island ("ARDC"), built for 1200 inmates, now holds almost 3,000 inmates. (Tr. 759.) As a result, there is a greater demand for program services in disproportionately smaller program areas. (Tr. 759.)

Another concern is staffing. With generic services, DOC requires fewer clergy, escort and security staff. (Tr. 759.) This also furthers security concerns, because a detention correctional system is designed to minimize inmate movement within a facility in order to lesson the chances of inmate altercations—either with escorting officers or passing inmates—or the exchange of contraband among inmates. (Tr. 759–60.) By minimizing different available services, DOC can reduce the movement taking place outside the housing areas, when escort officers would be needed. (Tr. 760.)

Generic services also have an impact on DOC's ability to classify and house inmates efficiently. (Tr. 760.) For example, since forty percent of inmates identify themselves as Catholic, DOC does not have to set aside a particular space for those inmates. There are enough Catholics so that they can be dispersed throughout the correction system according to their security classification, and whatever jail they are placed in will have enough other Catholic inmates to participate in a Catholic service. (Tr. 760.) If, however, inmates were classified by individual religious sects, DOC would have to consider religious affiliation in classifying and housing inmates. If such were the case, and if, for example, there were not enough Baptist inmates to be spread throughout the system, the Baptist inmates would have to be congregated in one jail in order to receive a Baptist service. This would adversely affect the security classification system in that high security Baptist inmates would be commingled with low security Baptist inmates. As a result, the jail would have to be operated at the highest security level, which is more expensive. (Tr. 760–61.) DOC is able to avoid this problem by offering generic services which gives it greater flexibility in housing inmates.[22] (Tr. 760–61.)

I find that it would be impossible for DOC to provide a separate congregate service for

---

**21.** Daly explained that, "We try to do things generically. We do things generically because it is much more efficient to do things generically, and it saves me money generally to do things generically." (Tr. 758.)

**22.** Once a year, at the request of DOC's rabbis, DOC gathers Jewish inmates from various facilities so that on a particular holy day there are sufficient Jewish inmates to form the *"minvan"* required in Jewish law for prayer. (Tr. 796–97.)

an individual sect or group such as the NOI consistent with the facts and operating principles discussed above. (*See* Tr. 761.)

## C. *Operations at the Brooklyn House of Detention*

DOC offered additional evidence about the implementation of DOC policy described *supra* in the context of testimony concerning the daily operations of one representative facility, the Brooklyn House of Detention. A borough facility such as this one is basically a new admission facility, where arrestees are sent following their arrest and arraignment. (Tr. 623.) Following inmates' remand to DOC custody, facility personnel review the history of newly-admitted inmates to determine their security classification, which in turn determines where they are housed.[23] (Tr. 673.) These inmates must be processed and assigned to a housing unit within twenty-four hours pursuant to a court mandate. (Tr. 623, 632–33.) The intake procedure includes a review of each inmate's history and a medical examination. (Tr. 623–24, 627.) Inmates frequently are transferred to different DOC facilities—in particular, to a Rikers Island facility—within seventy-two hours of their admission. They generally are returned later to the borough facility for trial or are transferred to court from Rikers Island on a daily basis. (Tr. 624, 646.)

Borough correctional facilities, such as the Brooklyn House of Detention, are high-rise structures comprised of cell blocks and dormitory housing. (Tr. 625.) For example, the Brooklyn House of Detention is twenty-two stories high and is comprised of cell-block housing only. (Tr. 625.) Cell blocks in the Brooklyn House of Detention are "H"-shaped, with each section housing thirty inmates for a total of 120 inmates per block. (Tr. 625–26.) Two correction officers are assigned to supervise a cell block of 120 inmates. (Tr. 625–26.) The Queens House of Detention For Men, by contrast, consists of dormitories, each of which typically houses fifty inmates. (Tr. 625.)

At the Brooklyn House of Detention, 325 correction officers and seventy-one civilians are assigned to the facility, which houses 815 inmates. (Tr. 626–27, 630.) In the months prior to trial, the Brooklyn House of Detention's uniformed staff has been reduced by eighteen correction officer "posts" due to budget cuts. (Tr. 629.)

Approximately 785 inmates at the Brooklyn House of Detention are detainees awaiting trial, while approximately thirty inmates have been convicted and sentenced. (Tr. 644.) About half of the inmate population at the Brooklyn House of Detention is relatively stable, *i.e.*, they will be housed there for a period of time, as opposed to the remaining half, which leaves the facility within seventy-two hours to be housed at Rikers Island. (Tr. 646–47.) The stable population consists of inmates under mental observation, in protective custody or maximum security and a portion of the general jail population. (Tr. 646–47.) The other half, which is a transient population, generally spends its short period of time in the Brooklyn House of Detention either in the law library or on the telephones trying to arrange bail. (Tr. 646–67.)

In the course of a typical weekday, approximately 200 inmates are transported from the Brooklyn House of Detention to court for trial, while approximately forty-five new admission inmates will enter the facility for the first time. (Tr. 631.) Inmates who are moved from a housing area to the Receiving Room to be transported to court must first be strip searched before leaving the facility, a process which requires approximately twelve to sixteen correction officers. (Tr. 632.) In addition, facility escort officers accompany inmates when they travel outside the jail, such as to Rikers Island for x-rays or to a City hospital for treatment. (Tr. 634–35.)

Operations at the Brooklyn House of Detention are considerably reduced on weekends, with no sanitation posts and reduced clerical functions. (Tr. 650–51.) On the busiest weekend tour of duty (8:00 a.m. to 4:00

---

**23.** High security inmates are typically housed in an individual cell rather than in an open dormitory. Such inmates are also typically housed in a Rikers Island facility because in the event of an escape from the facility, the inmate still faces other obstacles before being on the street, *i.e.*, the inmate is still trapped on Rikers Island itself. (Tr. 764.)

p.m.), only forty-five officers are an duty, as opposed to eighty officers on a weekday. (Tr. 651.)

The Brooklyn House of Detention provides various religious accommodations, such as Muslim, Catholic and Protestant congregate services [24] and Bible and Muslim study classes. Chaplains of the Protestant, Catholic, Muslim and Jewish faiths are assigned to the facility on varying schedules, and Catholic religious volunteers conduct a weekly service. (Tr. 634–35.) Inmates are also permitted to have visits with religious or spiritual advisers. (Tr. 645.)

The Muslim congregate service at the Brooklyn House of Detention is held on Friday. (Tr. 635.) Approximately ten to fifteen inmates attend the service there. (Tr. 635.) To be transported to the chapel area—which is not on the floor containing the housing areas—inmates gather in each housing area, where the post officer pat frisks them in order to prevent the transfer of contraband within the facility. (Tr. 636–37.) Although approximately thirty-five percent of the uniformed staff at the Brooklyn House of Detention is female, the Muslim inmates are searched only by male officers. (Tr. 637–38.) Qurans are searched by a correction officer using a hand transfixer. (Tr. 637.) A recreation post officer picks up the inmates on each housing floor on the elevator. (Tr. 636.) The inmates are then taken to the chapel area, where, prior to entry, they pass through a magnetometer and are searched once again. (Tr. 638.) During the service, an officer assigned to the chapel monitors the inmates. (Tr. 639.) At the conclusion of the service, the inmates are again frisked and escorted back to the housing areas in similar fashion. (Tr. 639–40.)

The Ramadan holiday is celebrated at the Brooklyn House of Detention. (Tr. 640.) Participating inmates are awakened before sunrise and given a bagged breakfast.[25] (Tr. 640.) At the conclusion of their daylight fast, the Muslim inmates are escorted to the chapel for prayers, where they are also provided Halal meals. (Tr. 640–42.) Visitors are allowed to meet with inmates at the end of the holiday celebration. (Tr. 641.) In recent years, Muslim inmates have been transported to a Rikers Island facility to celebrate as a larger assemblage. (Tr. 641, 657–58.)

Wangenstein testified that he had only one experience with a group of inmates requesting special services. (Tr. 651–52.) When Wangenstein was DOC Deputy Chief of Security, a group of inmates known as the "Latin Kings" presented a petition seeking a special meeting place to conduct services and prayers. While noting that the Latin Kings was not a recognized religion, the request was denied by DOC on the logistical grounds of limited staff and space. (Tr. 651–52, 663.) Wangenstein did not indicate that a group of NOI inmates requested special services; in fact, he stated that he was not aware of any of his inmates even being NOI members. (Tr. 650.)

### D. *Analogous Procedures On Rikers Island*

Wangenstein also testified to the differences in operating a jail on Rikers Island.

---

**24.** Although Wangenstein testified to a Seventh Day Adventist service on his facility schedule, the DOC Director of Ministerial Services, Imam Luqman, testified that there are no such separate services for this Protestant sect. (Tr. 659–61, 719–21.) I credit the testimony of Iman Luqman, who I find most knowledgeable about the types of religious services offered by DOC.

**25.** Breakfast for all inmates is served on a daily basis at 6:00 a.m. in order to accommodate the large number of inmates who have to be sent to court each day. (Tr. 643.) Thus, an inmate seeking to celebrate another fast, such as the NOI December Fast, would necessarily be accommodated through the normal practice. Wangenstein also indicated that he would defer to the recommendation of the DOC chaplain when confronted with an individual request such as a Ramadan fast. (Tr. 643–44.) He testified as follows:

Q. If an inmate came to you—assuming he went through channels—and said he wanted to celebrate a fast on a particular day in December, how would you respond to that?

A. I would probably tell him that he would have to put in an interview slip to speak to his religious adviser. And they would probably discuss it with the deputy warden of programs and bring it to me. And if it was out of my jurisdiction, then I would speak to the deputy commander for programs.

Q. Has anyone ever asked for that, in your experience?

A. I haven't had any of that, no.
(Tr. 643–44.)

Unlike the vertical high-rise jails in the boroughs, the ten facilities on Rikers Island are flat structures. On December 9, 1994, the Court conducted a site visit at the AMKC, a correctional facility on Rikers Island. AMKC houses approximately 2800 inmates and is broken down into seventy-three housing areas. (Tr. 649.) Modular housing area annexes have been added to the core facility to hold additional inmates. Wangenstein explained that it takes more time to get inmates to services because of the physical layout of the facilities, i.e., the long hallways laid out in a "T" shape. (Tr. 649.) It takes approximately fifteen to twenty minutes to walk from one end of AMKC to the other. During the site visit, I observed a number of program activities taking place off the main corridor, such as a law library, various clinics and a barbershop. In addition, I observed individual correction officers escorting apparently newly-admitted inmates, inmates cleaning the corridor floors and inmates delivering food carts.

The AMKC mosque is on the ground floor of AMKC. To attend a service at the mosque, groups of approximately ten to twenty inmates leave their housing areas and travel down the long expansive corridors at one time, under the supervision of correction officers stationed at fixed posts. (See also Tr. 401, 656.) Prior to entering the mosque, inmates are pat frisked or directed to step through a magnetometer. During the service, one or two correction officers observe the inmates from the back of the relatively spacious mosque. There appeared to be approximately forty-five to sixty inmates attending this particular service. After the service concluded, the inmates returned to their housing units in groups. Although the inmates were mostly unescorted by corrections officers, they were observed by stationed ary corrections officers.[26] When inmates reached their housing unit, they were checked in by a correction officer. (See Tr. 657.)

E. *Evidence Concerning the Number of NOI Inmates*

There was conflicting evidence concerning the number of NOI inmates incarcerated in DOC facilities. As stated *supra*, the evidence offered by defendants indicated that there were relatively few NOI inmates in their custody. For example, Imam Askia testified that he encountered only three inmates who belonged to the NOI during his four and a half years as a DOC facility chaplain. (Tr. 677.) Imam Luqman testified that he has encountered approximately ten inmates who belonged to the NOI during his twenty-year DOC career. (Tr. 713–14.) Imam Luqman also testified that plaintiff Muhammad was the only member of the NOI who requested special services. (Tr. 714.)

For the most part, evidence offered by the plaintiffs tended to indicate there were more, albeit an unknown number, of NOI inmates. Minister 9X was, at the time of trial, a minister of the prisons for the NOI.[27] (Tr. 848.) As such, he said, his role was to go into the prisons and offer instruction concerning NOI beliefs and that he had visited Rikers Island approximately seven times in the last nine months. (Tr. 848–50.) He testified that "many" inmates on Rikers Island had identified themselves to him as members of the NOI and that he was in written contact with NOI members. (Tr. 851–52.) Minister 9X also testified that he spoke to fifty inmates at one seminar and that, of those inmates, about twenty-five were "believers of Elijah Muhammad's teachings." (Tr. 862.) Minister 9X stated that he received about thirty or forty

26. Colonel Lucien LeClaire, the Director of Corrections Emergency Response Team Operations for DOCS, testified about the supervision of inmate movement. (Tr. 352, 400.) He explained that security coverage is provided both by officers who observe inmate movement and by officers who physically escort inmates. (Tr. 400.) He explained as follows:

[I]n a medium security facility, there may be officers stationed, as your Honor observed during the tour of Rikers Island, officers were stationed in a stationary position in a corridor and watched the inmates walk by them.... In a maximum security facility where inmates are escorted through long corridors where possibly visibility wouldn't be possible, by stationing an officer in a given spot, officers would escort groups of inmates up through those corridors. (Tr. 401.)

27. Minister 9X testified that he was in the process of being hired by DOCS. (Tr. 848–49.)

letters from inmates in the span of "a few months, every six months." (Tr. 866.)

However, I do not find that the evidence plaintiffs offered to be credible on the issue of the number of members of the NOI in DOC's custody. For example, Minister 9X identified only one inmate by name, a Norbert X, who was, according to Minister 9X, housed on Rikers Island.[28] (Tr. 852.) Minister 9X also offered what he described as a list from Norbert X of approximately twenty inmates housed on Rikers Island who identified themselves as members of the NOI. (Pl.Ex. 59; Tr. 854–66.) However, there was no credible evidence indicating that the list was used by Minister 9X in such a way as properly to ensure its reliability.[29] Little, if any evidence, was offered concerning the circumstances surrounding the compilation of the list; we do not know what the inmates were told in order to induce them to put their names on the list, and the cover letter from Norbert X that accompanied the list does not assuage such concerns.[30] Also, nothing in the list or the cover letter indicates the *inmates* actually knew that putting

---

**28.** This is despite Minister 9X's assertion that a majority of the inmates he met on Rikers Island were NOI members.

> Q. Were there other instances in which you met inmates who were members of the Nation of Islam?
>
> A. I've been on it [Rikers Island], approximately, several times. And every time I've been on it, the majority of inmates that I met were believers in the teaching of Elijah Muhammad.

(Tr. 862.) Perhaps Minister 9X simply did not encounter a random sampling of inmates, *i.e.,* he testified that he went to Rikers Island to provide seminars concerning NOI teachings, or perhaps the inmates who met with him expressed their interest—albeit not their membership—in the NOI. Regardless, I find it difficult to believe that the "majority of inmates" on Rikers Island belong to the NOI, particularly in light of the other evidence and my own observations.

**29.** For example, Minister 9X testified as follows:

> Q. What is it that you do when you receive the list of identification of inmates who are members of the Nation of Islam?
>
> A. I compile it for my evidence, for my documents.
>
> \* \* \* \* \* \*
>
> Q. Can you tell me, does the Nation of Islam use the list of their members to provide documents, materials and information for various purposes.

---

their names on the list would be interpreted as meaning they belonged to the NOI. For example, there is no statement such as "I belong to the Nation of Islam" on the page with the list of names; indeed, on that page with the names, there was nothing except those names, the inmates' identification numbers and their housing area. In short, I do not find that this evidence is entitled to much weight.

The other evidence offered by plaintiffs appears to be affirmations executed by other inmates that plaintiff Muhammad obtained during his incarceration on Rikers Island after trial.[31] (Declaration of Colleen D. Duffy in Support of Motion to Reopen the Record to Admit New Evidence dated May 31, 1995 ("Duffy Decl.") ¶ 3, Ex. B.) Each affirmation consists of a form containing three statements to which an inmate may respond and five other statements to which no response is required. The statements to which an inmate may respond are as follows:

1) I AM A MEMBER OF THE NATION OF ISLAM [ ]

---

> A. Yes, we do.

(Tr. 854–55.) Minister 9X believes "99 percent" of the names on NOI mailing lists were those of NOI members because the names had "X"'s on the end. (Tr. 866.) Nonetheless, the reliability of this list is not ensured by its use for the purposes stated by Minister 9X. For example, one can easily imagine that an inmate whose name appears on the list was interested in receiving and perusing NOI materials without actually belonging to the NOI.

**30.** For example, the cover letter states in part that:

> I just received your letter and I was glad and most honored to hear from you ... I did the best that I could with the shortness of time that I had to honor your request. Allah knows that if I had more time, I could have gotten more signatures but, nevertheless, I hope this will suffice. Bro. Rob, I going through some problems with this letter & flyer you've sent. As you know, alot of brothers are believers in Al-Islam (which I explained to you in my last letter).... Anyway, I wish I had more time to get more signatures. So, for now, this will have to suffice.

(Pl.Ex. 59.)

**31.** By a Memorandum and Order dated April 25, 1995, I denied plaintiffs' request to reopen the record to admit this evidence. Upon reconsideration, I have decided to admit the evidence.

2) I AM INTERESTED AND WANT A NATION OF ISLAM SERVICE [ ]

3) I WANT TO CHANGE MY RELIGION TO THE NATION OF ISLAM [ ]

(Duffy Decl., Ex. B (capitalization and spacing in original).) [32] Plaintiffs offered approximately fifty affirmations and/or letters stating much the same as the forms. I find this evidence unreliable and, accordingly, entitled to little weight.

First, the affirmations are unreliable on their face. Some inmates have checked only that they are "interested" in NOI services. Some checked the boxes indicating that they are members of NOI and want services. Others checked all three boxes, prompting the question how an inmate could simultaneously belong to the NOI and yet desire to join the NOI. In short, it is impossible to discern whether this material is anything other than a testament to the persuasive powers of plaintiff Muhammad.[33]

Second, the reliability of the affirmations is called into question in light of plaintiff Muhammad's testimony. At trial, he testified about his role in educating inmates who expressed interest in learning about NOI, describing his role as "bait to fish." (Tr. 415–18.) He did not, however, testify that there were actual *members* of the NOI to be found in the kinds of numbers that the affirmations seem to suggest. (Tr. 415–18; Calhoun Decl., Ex. B at 29–30). In addition, plaintiff testified during his deposition that, while he was at GRVC on Rikers Island, there were "several individuals, some of whom I had recruited" who belonged to NOI, "a brother who was already a member of the Nation of Islam," and "one other individual who had been a member previously." (Calhoun Decl., Ex. B.) He also stated that he "recruited" fifteen inmates in all. (*Id.*) Thus, it appears plaintiff encountered rather different numbers of NOI inmates during different periods of incarceration in DOC facilities. This discrepancy either diminishes the weight of

---

**32.** The statements to which no response is required are:

4) I BELIEVE THAT ALLAH CAME IN THE PERSON OF MASTER W. FARD MUHAMMAD
5) I BELIEVE THAT THE HONORABLE ELIJAH MUHAMMAD IS THE MESSENGER OF OF [sic] ALLAH IN THE NATION OF ISLAM
6) I BELIEVE IN THE DIVINE LEADERSHIP OF MINISTER LOUIS FARRAKHAN
7) I SUPPORT MINISTER ABDUL–SHAHID FARRAKHAN–MUHAMMAD AND WANT HIM AND MINISTER ROBERT 9X AND ALL OTHER AVAILABLE MINISTERS TO COUNSEL ME AND SERVICE MY RELIGIOUS NEEDS.
8) I WANT A SEPARATE SERVICE AND CLASSES TO BE ASSISTED BY MINISTER ABDUL–SHAHID FARRAKHAN–MUHAMMAD, MINISTER ROBERT 9X AND ANY ALL REPRESENTATIVE [sic] FROM THE NATION OF ISLAM EXCLUSIVELY, AT LEAST THREE TIMES A WEEK.
(Duffy Decl., Ex. B (capitalization in original).)

**33.** Defendants point out that the affirmations are a response to plaintiff Muhammad's solicitation. Defendants also note that when the affirmations were originally proposed, the package forwarded to the defendants from plaintiffs' counsel included a notice from plaintiff Muhammad purportedly describing the instant lawsuit and exhorting his fellows to come forward. (Calhoun Decl. ¶ 5 & Ex. D.) The solicitation is not presently included in the proffered package of documents. (*See* Duffy Decl. & Exs.) The text of the letter reads as follows:

MY DEAR BROTHERS:
MOST RECENTLY, THE NATION OF ISLAM WON ITS LAWSUIT AGAINST CORRECTIONS FOR THE STATE AND AWAITS A FINAL DECISION AGAINST THE CITY DEPT. OF CORRECTIONS FOR A PROGRAM ENVISIONED BY THE HONORABLE ELIJAH MUHAMMAD. IT IS THE CONTENTIONS OF THE CITY TO APPEAL BASED ON THE ASSUMPTION THAT THERE IS NO ONE ON RIKER'S ISLAND WHO ARE MEMBERS OF THE NATION OF ISLAM, OR ARE INTERESTED IN LEARNING ABOUT THE NATION OF ISLAM, OR WANT TO BECOME MEMBERS OF THE NATION OF ISLAM.
WITH THE WILL OF GOD AND IN BACKING THE HONORABLE MINISTER LOUIS FARRAKHAN AND THE WORK OF THE NATION OF ISLAM, WE KNOW THAT THEIR SO–CALLED ASSESSMENT IS WITHOUT MERIT. THUS, I ASK OF YOU AS A MINISTER IN THIS DIVINE WORK, TO STAND UP AND BE COUNTED. PLEASE SIGN THE LIST THAT APPLIES TO YOU AND HAVE YOUR ILC REPRESENTATIVE OR ONE RESPONSIBLE, TO DELIVER THE FULL COMPLETION OF THE LIST TO BROTHER BROWN X WHO IS A CLERK AT THE LAW LIBRARY. IF YOU ARE UNDER STATE JURISDICTION, YOUR NAME CARRIES MORE WEIGHT. IF YOU HAVE ANY QUESTIONS, PLEASE CALL ON ME AT THE LAW LIBRARY. THANK YOU AND MAY ALLAH BLESS YOU.
(Calhoun Decl., Ex. D (capitalization and grammar in original).)

plaintiffs' evidence and/or supports the defendants' point that DOC's prison population is constantly in flux.

Plaintiffs have stated that, to the extent that I deem these fifty or so affirmations unreliable, they seek to supplement the record to allow deposition or live testimony from each inmate identified in the documents about his membership in the NOI and desire to participate in NOI religious services and classes. (Plaintiffs' Memorandum of Law in Support of Motion to Reopen the Record to Admit Newly Discovered Evidence ("Pl.Mot. to Reopen") at 8–9.) Deeming plaintiffs' statement as a request to reopen the record yet again, the request is hereby denied. Plaintiff Muhammad could have given a more carefully worded form to the inmates, and plaintiffs could have offered, at the time of their motion to reopen, a more complete evidentiary background detailing the circumstances of the completion of the forms. Their failure to do these things is hardly the fault of the defendants; it was no surprise to plaintiffs that the question of the number of inmates who belong to the NOI would be an issue in the case. In short, plaintiffs have had ample opportunity to litigate this case, *i.e.*, first, at the time of trial and second, at the time they moved to reopen the record. They shall not have a third opportunity. To rule otherwise would result in flagrant disregard for the principles of finality and judicial economy.

In sum, considering all of the evidence and the circumstances under which testimony was given, I credit the testimony of Imam Askia and Iman Luqman and find that over the last twenty years and continuing to the time of trial, there have been no more than a handful of members of the NOI in the DOC system at any time, and, of those, only plaintiff Muhammad has made a request for additional accommodations.

F. *Federal Bureau of Prisons' Religious Accommodations*

Evidence was offered at trial concerning the religious accommodation policies and practices of the Federal Bureau of Prisons (the "Bureau"). (*E.g.*, Pl.Exs. 3, 7, 11, 12.) The Bureau formally recognizes the NOI as a distinct Muslim organization (Pl.Ex. 3 at 12–13), and there can be no question that the Bureau provides greater institutional opportunity for observing NOI religious practices on a *group* basis.

However, the evidence indicates that DOC attempts to offer to NOI inmates as *individuals* opportunities similar to those provided institutionally on a group basis by the Bureau. For example, the Bureau has contracted with NOI representatives to enable knowledgeable, NOI-certified persons to speak to inmates. (Pl.Ex. 3 at 15–16; Pl.Ex. 7.) The Bureau compensates the NOI representatives who come to Bureau facilities. (Pl.Ex. 3 at 17.) There are, however, only "a few" NOI representatives with such Bureau contracts. (Pl.Ex. 3 at 15–16.) I find this practice to be comparable to the DOC practice of inviting NOI representatives to meet with inmates for various activities other than group religious services. (Tr. 630, 805–06, 811, 849–850.)

Both the Bureau and DOC allow inmates to have access to NOI literature. For example, the Bureau permits and supports the *Final Call* newspaper. (Pl.Ex. 3 at 20–24; Pl.Ex. 7.) The Bureau also purchases literature pertaining to the NOI to be read by inmates. (Pl.Ex. 3 at 20–23.) DOC also allows religious literature to be disseminated freely among its inmates. (Pl.Ex. 58, Title 40, § 1–14(a).) Plaintiff himself testified that during his incarceration on Rikers Island, he received literature not only from NOI representatives, but also from DOC employees, who encouraged him in his studies. (Tr. 419–420.) Indeed, the assistance rendered by DOC employees was ample enough to allow plaintiff to train to become an NOI ministerial representative while in DOC custody. (Tr. 419–21.)

The Bureau recognizes Savior's Day and Founder's Day as NOI religious holidays. (Pl.Ex. 3 at 25–27; Pl.Ex. 12 at 3.) The Bureau also makes accommodations to allow NOI inmates to observe the December Fast. (Pl.Ex. 3 at 25, 27, 29–30; Pl.Ex. 11; Pl.Ex. 12 at 3.) The Bureau does not formally celebrate all religious holidays, however, due to the enormous number of holidays. For example, although the Jewish faith recog-

nizes thirteen major holidays, inmates may celebrate only one holiday while in Bureau custody, which is usually Passover. (Pl.Ex. 3 at 27.) DOC, as described *supra*, does not recognize the December Fast formally, but has a liberal policy of accommodating individual requests. (Tr. 704–17.)

In short, there are differences between the religious accommodations available in Bureau and DOC facilities. However, I find that the differences in accommodations are only marginal when compared to the enormous differences in the characteristics of the Bureau and the DOC systems. For example, as described *supra*, DOC operates an essentially transitional facility that houses pre-trial detainees awaiting trial. I find that a system as dynamic as the City system—in which over 110,000 inmates pass through yearly after relatively short periods of time in custody (Def.Ex. E)—cannot provide its religious services in the same manner as the Bureau.[34]

### CONCLUSIONS OF LAW

This Court has subject matter jurisdiction over this action, and venue in this district is proper pursuant to federal law. This Court has personal jurisdiction over the City defendants pursuant to federal and state law.

### I. *The Religious Freedom Restoration Act*

Plaintiffs' first cause of action alleges that defendants' conduct violated the Religious Freedom Restoration Act of 1993 ("RFRA"). (Second Am.Compl. ¶¶ 52–58.) RFRA provides that governmental action should not substantially burden the free exercise of religion unless it advances a compelling governmental interest. Specifically, RFRA provides in pertinent part that:

(a) In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling interest.

42 U.S.C. § 2000bb–1. RFRA applies to both the federal and state governments as well as subdivisions of the state government. 42 U.S.C. §§ 2000bb–2(1), 2000bb–3. RFRA applies retroactively. 42 U.S.C. § 2000bb–3(a).

RFRA purports to restore the "compelling interest" test of *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), which had been abandoned in *Employment Division v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). 42 U.S.C. § 2000bb(b)(1); *see, e.g., Alameen v. Coughlin*, 892 F.Supp. 440, 446–47 (E.D.N.Y.1995); *Francis v. Keane*, 888 F.Supp. 568, 572–73 (S.D.N.Y.1995); *Campos v. Coughlin*, 854 F.Supp. 194, 204–07 (S.D.N.Y.1994). In Congress's view, *Smith* "virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion." 42 U.S.C. § 2000bb(a)(4); *see, e.g., Alameen*, 892 F.Supp. at 446.

RFRA applies to the claims of prisoners.[35] *Werner v. McCotter*, 49 F.3d 1476, 1479 (10th Cir.), *cert. denied*, —— U.S. ——,

---

**34.** Plaintiffs previously have recognized that "this Court can ascertain whether any alleged differences in size or budget bear upon conclusions plaintiffs might ask the Court to draw from the evidence," and that such differences affect "only the weight this Court should afford the evidence, *not* its admissibility." (Plaintiffs' Memorandum of Law in Opposition to Motion *in Limine* to Exclude Plaintiffs' Evidence ("Pl.Opp. to *in Limine* Motion") at 4–5 (emphasis in original).) Plaintiffs have not offered any evidence that persuades me that the Bureau and DOC are

sufficiently similar such that the two corrections systems can be required to provide the same religious accommodations to NOI inmates. Indeed, as noted above, the totality of the evidence indicates that, *inter alia*, the smaller size and exceedingly dynamic nature of the DOC system make any comparison to the Bureau system, or, indeed, to the DOCS system, wholly inapposite.

**35.** In *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), the Supreme Court stated that prison regulations affect-

115 S.Ct. 2625, 132 L.Ed.2d 866 (1995); *Bryant v. Gomez,* 46 F.3d 948, 948 (9th Cir. 1995); *Brown–El v. Harris,* 26 F.3d 68, 69 (8th Cir.1994); *Alameen,* 892 F.Supp. at 447 (collecting cases); *Francis,* 888 F.Supp. at 574; *Campos,* 854 F.Supp. at 204–07. However, in enacting RFRA, Congress did not intend that courts would no longer extend the deference traditionally accorded prison administrators:

> The committee does not intend the act to impose a standard that would exacerbate the difficult and complex challenges of operating the Nation's prisons and jails in a safe and secure manner. Accordingly, the committee expects that the courts will continue the tradition of giving due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources. At the same time, however, inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the act's requirements.

*Alameen,* 892 F.Supp. at 447 (quoting S.Rep. No. 111, 103rd Cong., 1st Sess., *reprinted in* 1993 U.S.C.C.A.N. pp. 1892, 1899–1900 (footnote omitted)); *see also Werner,* 49 F.3d at 1479–80; *Francis,* 888 F.Supp. at 574.

■ Under RFRA, "[t]he threshold issue ... is whether the plaintiff's exercise of religion has been laden with a 'substantial burden.'" *Prins v. Coughlin,* No. 94 Civ. 2053 (MBM), 1994 WL 411016 at *1 (S.D.N.Y. Aug. 3, 1994); *see also Francis,* 888 F.Supp. at 573 n. 6 (stating that "a plaintiff asserting a claim under RFRA must make a threshold showing that his or her religious exercise has been substantially burdened before requiring the government to meet its burden of production and persuasion with respect to proving a compelling governmental interest and the use of the least restrictive means"). In order to establish that a plaintiff's exercise was substantially burdened, a plaintiff must

"demonstrate that the government's action pressures him to commit an act forbidden by his religion or prevents him from engaging in conduct or having a religious experience mandated by his faith." *Davidson v. Davis,* No. 92 Civ. 4040 (SWK), 1995 WL 60732 at *5 (S.D.N.Y. Feb. 14, 1995) (citing *Graham v. Commissioner,* 822 F.2d 844, 850–51 (9th Cir.1987), *aff'd sub nom., Hernandez v. Commissioner,* 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989)). In addition, "[t]his interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine." *Davidson,* 1995 WL 60732 at *5 (quoting *Graham,* 822 F.2d at 851). *See also Bryant v. Gomez,* 46 F.3d 948, 949 (9th Cir.1995); *Vernon v. City of Los Angeles,* 27 F.3d 1385, 1393–94 (9th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 510, 130 L.Ed.2d 417 (1994); *Alameen,* 892 F.Supp. 440, 448 (E.D.N.Y.1995) (stating that "to impose a substantial burden, government interference must be more than an inconvenience. The interference must burden a belief central to a plaintiff's religious doctrine."); *but see Muslim v. Frame,* 897 F.Supp. 215, 218 (E.D.Pa.1995) (stating that "it is unnecessary under RFRA for a prisoner to demonstrate that the religious practice at issue is mandated by his religion" but noting that "[t]o be sure, a number of other courts have reached a different conclusion"). The Court of Appeals for the Tenth Circuit has recently explained that:

> To exceed the "substantial burden" threshold, government regulation must significantly inhibit or constrain conduct or expression that manifests some central tenet of a prisoner's individual beliefs; must meaningfully curtail a prisoner's ability to express adherence to his or her faith; or must deny a prisoner reasonable opportunities to engage in those activities that are fundamental to a prisoner's religion.

*Werner,* 49 F.3d at 1480 (citations omitted).

■ Once a plaintiff has demonstrated the existence of a substantial burden on his or her exercise of religion, the burden then

---

ing prisoners' right to free exercise of religion will be upheld if the regulations are reasonably related to a legitimate penological interest. However, courts since have found that RFRA overrules *O'Lone. E.g., Werner v. McCotter,* 49 F.3d 1476, 1479 (10th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2625, 132 L.Ed.2d 866 (1995); *Brown–El v. Harris,* 26 F.3d 68, 69 (8th Cir. 1994); *Campos v. Coughlin,* 854 F.Supp. 194, 206 (S.D.N.Y.1994).

shifts to the government to establish that the challenged action or policy furthers a compelling state interest in the least restrictive manner. 42 U.S.C. § 2000bb–1(b); *Werner,* 49 F.3d at 1480 n. 2; *Francis,* 888 F.Supp. at 572 n. 6; *Davidson,* 1995 WL 60732 at *5. Prison security and penological institutional safety goals are unquestionably compelling governmental interests.[36] *Woods v. Evatt,* 876 F.Supp. 756, 769 (D.S.C.1995); *Campos,* 854 F.Supp. at 207. Of course, "merely brandish[ing] the words 'security' and 'safety' " does not result in a defendant's conduct "automatically being deemed constitutionally permissible." *Campos,* 854 F.Supp. at 207.

### A. *Substantial Burden*

In the instant case, plaintiff Muhammad contends that DOC has substantially burdened his free exercise of religion by refusing to (i) hire any NOI ministers as chaplains, (ii) provide congregate NOI religious services, (iii) provide NOI religious texts to NOI members on the same basis as DOC provides religious texts to followers of other religions and (iv) accommodate observance of NOI holidays, *i.e.,* Savior's Day, Founder's Day and the December Fast. I do not agree.

### 1. *Ministers*

■ DOC's failure to employ an NOI minister does not substantially burden Muham-

mad's free exercise of his religion. The Court of Appeals for the Tenth Circuit has stated recently that:

> [RFRA] need not drive a prison to employ clergy from every sect or creed found within its walls; however, the failure to provide or allow reasonably sufficient alternative methods of worship would, in the absence of a compelling state interest, run afoul of [RFRA].

*Werner,* 49 F.3d at 1480. In *Werner,* plaintiff, an inmate in the Utah prison system, contended that the Utah prison system unconstitutionally interfered with the free exercise of his religion, *i.e.,* Native American shamanism. Plaintiff challenged, *inter alia,* the prison's failure to provide him with access to a Cherokee Native American spiritual advisor. The Court found that this claim was without merit because the prison in which plaintiff was incarcerated employed six part-time chaplains who provided nondenominational religious support to the prisoners. *Id.* at 1481. Although none of these chaplains was a Native American, there were two Native American spiritual advisors who provided services on a volunteer basis. *Id.* Thus, the Court held RFRA was not violated.[37]

In the instant case, it is undisputed that DOC does not employ an NOI minister.

---

**36.** Plaintiffs contend that any additional cost to DOC of accommodating plaintiffs' religious needs as NOI members as described by the plaintiffs is not a compelling interest as a matter of law. (Plaintiffs' Proposed Findings of Fact and Conclusions of Law ("Pl.Proposed Findings") at 43.) However, the cases cited by plaintiff are inapposite inasmuch as they pertain neither to RFRA nor to prisoners. In addition, plaintiffs' argument is refuted by the language of legislative history quoted *supra,* in which Congress specifically approved "consideration of costs and limited resources." S.Rep. No. 111, 103rd Cong., 1st Sess., *reprinted in* 1993 U.S.C.C.A.N. pp. 1892, 1900.

**37.** Other recent decisions, while not as focused on the issue of the availability of clergy of a particular sect or denomination, are certainly consistent with the reasoning of *Werner.* For example, in *Prins v. Coughlin,* No. 94 Civ. 2053 (MBM), 1995 WL 378526 (S.D.N.Y. June 26, 1995), plaintiff, a prisoner, claimed that his transfer from Green Haven Correctional Facility ("Green Haven") to Clinton Correctional Facility ("Clinton") substantially burdened his free exercise in violation of RFRA. Judge Mukasey de-

nied his motion to amend his complaint because the proposed amendment would have been subject to dismissal for insufficiency pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Id.* at *1. The plaintiff apparently sought to allege that there were fewer Jewish services at Clinton than at Green Haven and that there were no Orthodox services provided there. Judge Mukasey distinguished between the importance of providing kosher food and offering religious services to plaintiff's liking as follows:

> The need for religious services and counseling of a particular frequency and character necessarily depends on the character of the prison population and, unlike the need for kosher food, cannot be met practically on an individual basis. It is practical to require that meals meeting the standard of [*Kahane v. Carlson,* 527 F.2d 492 (2d Cir.1975)] be provided daily even if only one person needs them; *it is not practical to require that a clergyman be provided daily simply because one person needs him....* Plaintiff has made no allegation that the services and counseling provided at Clinton are inadequate to the population at that

However, there are numerous imams who are orthodox Muslims, and DOC offers numerous religious services and accommodations for Muslim inmates, including (i) a generic congregate Muslim prayer service (*Jumu'ah*) offered every Friday and (ii) religious study groups.

If an inmate who belongs to the NOI prefers spiritual guidance from an NOI minister, that inmate has that opportunity. As discussed *supra*, DOC has a flexible and tolerant policy of permitting inmates to have unlimited personal clergy/counsel visits with any spiritual leader, including NOI ministers. McCloud has worked with Minister 9X to have NOI volunteers provide personal development workshops.[38] The workshops focus on the themes stressed in NOI religious services, among them, African–American empowerment, self-reliance and responsibility. DOC has stated its commitment to expand this program. In addition, prominent NOI members, including Minister Muhammad of Temple No. 7 in Harlem, have visited DOC facilities as guest speakers. These activities not only contribute to meet the specific needs of NOI inmates, but also refute plaintiff's contention that DOC is hostile to NOI principles. In short, although plaintiff may not have had access to an NOI minister employed by DOC, it cannot be fairly said, and I

do not find, that plaintiff's free exercise has been substantially burdened.

### 2. *Congregate Services*

■ I find that plaintiff's free exercise was not substantially burdened by DOC's failure to offer a congregate NOI religious service. Plaintiff has not shown that the absence of a congregate NOI service is "more than an inconvenience" and that its absence is "substantial" and an "interference with a tenet or belief that is central to religious doctrine." *Bryant v. Gomez*, 46 F.3d 948, 949 (9th Cir. 1995) (quoting *Graham v. Commissioner*, 822 F.2d 844, 851 (9th Cir.1987), *aff'd sub nom. Hernandez v. Commissioner*, 490 U.S. 680, 699, 109 S.Ct. 2136, 2148, 104 L.Ed.2d 766 (1989)). In *Bryant*, a Pentecostal prisoner claimed that the defendants' refusal to hold full Pentecostal services violated his religious rights under RFRA. The prisoner alleged he was precluded from "participating in the practices and using the 'traditional instruments' which are specific to his faith and distinct from other Protestant faiths." *Id.* The Court of Appeals for the Ninth Circuit rejected his claims. First, the Court found that the mere fact that certain practices and instruments were "unique" to the Pentecostal faith did not make them "mandated" by that

facility, but only that they do not serve his particular orientation. Thus, there is no suggestion that he has been transferred from an institution that meets the religious needs of its population to an institution that does not. *Id.* at *2 (emphasis added).

Similarly, in *Davidson v. Davis*, No. 92 Civ. 4040 (SWK), 1995 WL 60732 (S.D.N.Y. Feb. 14, 1995), plaintiff alleged that his rights were violated while he was incarcerated at the Metropolitan Correctional Center because, *inter alia,* he was denied access to the facility's Jewish chaplain. Judge Kram, concluding plaintiff's exercise was not substantially burdened and dismissing his claim, acknowledged plaintiff's constitutional right to practice his religion but found that the prison staff was "not under an affirmative duty to provide each inmate with the spiritual counselor of his choice." *Id.* at 6 (citations omitted). I note that, although the cases relied upon by the Court in *Davidson* were not RFRA cases, Judge Kram still found them worthy of reference. *See also Weir v. Nix*, 890 F.Supp. 769 (S.D.Iowa 1995) (finding no free exercise, RFRA or equal protection violation where plaintiff prisoner, a Christian fundamentalist, was provided with access to a minister who was also a Christian

fundamentalist but with beliefs that differed concerning the religious doctrine of "separatism" and stating that a prisoner "is not entitled to insist on a religious adviser whose beliefs are completely congruent with his").

**38.** There was testimony at trial indicating that there had been some difficulties due to the schedules of the NOI volunteers. In a case where a prisoner sought to practice his Native American religion, the Court of Appeals for the Sixth Circuit recently noted that:

To the extent that some of the cancelled [religious] meetings involve the failure of a volunteer practitioner of Native American rituals to appear at the prison, the plaintiff offers no reason why this failure to appear should be held against the prison authorities.

*Allard v. Abramajtys*, 54 F.3d 776, n. 1 (6th Cir. May 12, 1995) (unpublished disposition; text available in Westlaw, No. 94–2161). I merely note and do not rely upon this case inasmuch as Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel or the law of the case.

faith, and plaintiff did not argue or offer evidence indicating that they were mandated. *Id.* Second, the Court of Appeals pointed out that:

> [Plaintiff] has not given this court any basis for concluding that he cannot accomplish the mandates of his religion through the means that the defendants do provide in his prison. These include 1) "interfaith" Christian services that are designed to accommodate the needs of various Christian denominations, 2) Pentecostal literature in the prison library, and 3) a Pentecostal volunteer who is available to attend Bible study classes and focus more specifically on the beliefs of the Pentecostal faith.

*Id.* at 949–50.[39]

In the instant case, plaintiff has demonstrated with ample evidence many of the ways in which his beliefs differ from beliefs associated with orthodox Islam. However, he has not demonstrated that the generic Muslim service offends or ignores particular practices or beliefs that are *mandated* by NOI teachings.[40] Indeed, given the undisputed similarities in beliefs between orthodox Muslims and NOI members, *see* Findings of Fact *supra* part I, I find that the generic

Muslim services provide comfort and solace to NOI members without pressuring such members to commit acts forbidden by their religion or preventing them from engaging in conduct or having a religious experience mandated by their faith. Moreover, the aspect of the Muslim generic service that plaintiff told Imam Askia that was lacking—emphasis on African–American themes such as empowerment, responsibility and self-reliance—was, according to Imam Askia, addressed already. To the extent such topics were not addressed, Imam Askia was willing to incorporate those themes to a greater extent in the generic Muslim service. In addition, the NOI self-development workshops already available focus on these very themes. Prominent NOI figures have spoken in DOC facilities. Inmates have the opportunity for unlimited clergy/counsel visits with spiritual advisors, including NOI volunteers. In short, plaintiff has not shown that he "cannot accomplish the mandates of his faith through the means that the defendants do provide in his prison," *Bryant,* 46 F.3d at 949, or that the absence of an NOI congregate religious service has substantially burdened the exercise of his religious rights.[41]

---

**39.** *Weir v. Nix,* 890 F.Supp. 769 (S.D.Iowa 1995) is not dissimilar. In that case, a fundamentalist prisoner claimed, *inter alia,* that the prison should provide him and other Christian fundamentalists with a spiritual adviser who could conduct services consistent with his beliefs. The court stated:

> [W]hen the only option available for a prisoner is under the guidance of someone whose beliefs are significantly different from or obnoxious to his, the prisoner has been effectively denied the opportunity for group worship and the result may amount to a substantial burden on the exercise of his religion. A prisoner, however, is not entitled to insist on a religious adviser whose beliefs are completely congruent with his. As the Court has found, the present Protestant chaplain is a fundamentalist Christian whose beliefs vary from Weir's only with respect to the doctrine of separatism. [The chaplain] understands and preaches the basic tenets of fundamentalist faith. He is capable of ministering to fundamentalist inmates and he has done so to the apparent satisfaction of those who testified. Weir therefore has the opportunity to attend group worship led by a capable, willing religious leader whose beliefs are not significantly different from his own.

> Accordingly, there is no free exercise, RFRA, or equal protection violation here.

*Id.* at 788 (citations omitted). The point that a prison is not required by RFRA to provide congregate services led by a chaplain whose beliefs are completely congruent with those of any particular inmate/plaintiff is well-taken.

**40.** By means of comparison, in *Campos v. Coughlin,* 854 F.Supp. 194 (S.D.N.Y.1994), members of the Santeria faith alleged that they *"must* wear sacred [Santeria] beads of certain color combinations" because the beads, "when worn, protect [them] from danger and from evil to which [they] might otherwise be vulnerable" and that the beads "when worn, will bring [them] good fortune, peace, purity and good health." *Id.* at 200 (alterations in original) (emphasis added).

**41.** In addition, I note, but do not rely upon, a recently rendered unpublished decision by the Court of Appeals for the Sixth Circuit, *Johnson v. Baker,* 67 F.3d 299, No. 94–3828, 1995 WL 570913 (6th Cir. Sept. 27, 1995). In *Johnson,* the plaintiff, a state prisoner who belonged to the NOI, brought suit under RFRA and claimed that his faith was sufficiently different from that of orthodox Islam such that he must be afforded a separate religious service. *Id.* at *1. The Court

### 3. *Literature*

■ I find that plaintiff's free exercise has not been substantially burdened with respect to literature. DOC's liberal policy concerning literature has been discussed at length. Inmates can and do receive and retain religious literature, including the *Final Call.* In addition, plaintiff himself testified that he received NOI literature during the time of his incarceration in DOC facilities.

### 4. *Holidays*

■ I find that plaintiff's free exercise has not been substantially burdened with respect to celebration of NOI holidays. All Muslim inmates are allowed to observe Ramadan, the month-long daylight fast observed by all Muslims, including members of the NOI. In addition, there is no prohibition on NOI members' observing their unique December Fast; during December, breakfast is served before sunrise and dinner is served after sunset in DOC facilities for all inmates. Plaintiff himself concedes that he never asked to celebrate the December Fast while he was in DOC custody.

### 5. *Other*

As discussed *supra,* NOI members may observe their faith in a variety of ways while in DOC custody, including provision of Halal meals and wearing Muslim attire, be it the kuffi traditionally worn by many orthodox Muslims or the white shirt, bow tie and star and crescent pin worn by NOI members, including plaintiff, during his period in DOC custody. In addition, male Muslim inmates are searched only by male correction officers.

While plaintiff was incarcerated on Rikers Island, he was able to study to become an NOI ministerial representative. He received the necessary literature from various sources, and DOC staff members, including one captain, who personally delivered literature to plaintiff from Minister Muhammad of Temple No. 7 in Harlem. These events indicate that plaintiff was not substantially burdened in the exercise of his religion.

■ Plaintiff's sole dissatisfaction with the religious accommodations he received while in DOC custody appears to center on a dispute he claims to have had with Imam Askia concerning his supposed election as

---

noted that several religious groups including Islamic, Jehovah Witness, Jewish, Protestant and Catholic were provided a time and place for meeting at the plaintiff's prison. *Id.* Inmates were also free to "supplement these activities with individual pursuits." *Id.* The plaintiff contended that what the prison offered was inadequate because, while plaintiff believed in "some of the basic tenets of the Islamic religion," he also had certain unique beliefs as a member of the NOI. *Id.* at *2.

The Court of Appeals, citing *Bryant,* explained that:

We first note that this case differs from those involving the prohibition of some specific practice of a person's religion, such as the smoking of peyote or the sacrifice of live animals. [Plaintiff] has no proscriptions placed on his beliefs or the practices of his religion, but is simply deprived of a special time and place to observe his beliefs exclusively with others who profess the same faith. We emphasize "exclusively" because all of those who claim to be Nation of Islam Muslims may attend together the regular Islamic service. . . .

The record reflects two categorical differences between the Nation of Islam Muslim and other Islamic practitioners. In the first category are those differences that do not affect the religious service itself but relate to personal beliefs. For example, Nation of Islam Muslims

do not believe in reincarnation. There is no showing, however, that [plaintiff] cannot meaningfully participate in an Islamic religious service simply because he may be in the present of others who do believe in reincarnation.

The second category involves specific practices involved with the service itself. The principal, if not only, difference referenced in the record involves the body position during prayers. . . . Here again, if there is any real strength of belief, it would not seem to destroy the value or meaning of the service if people assume somewhat different postures during prayer. . . . [I]n the prison context, actions taken for one inmate may legitimately be viewed in the context of its ripple effect on the entire prison population. What is done for one will have to be done for others.

*Id.* at *4–5 (footnotes omitted). The *Johnson* court concluded that plaintiff's beliefs had not been substantially burdened and declined to reach the compelling government interest issue. *Id.* at *5.

The *Johnson* court also found that "the number of persons within the prison professing belief in a specific religion or sect is also a factor properly considered in deciding an issue of this nature," *id.* at *6 n. 6, while noting that Johnson was the only plaintiff before it and that the case was not a class action. *Id.*

Muslim inmate representative. Plaintiff claims that he was elected, and that, in response to his "election," Imam Askia became extremely hostile to him, refusing to allow plaintiff to serve unless he repudiated his beliefs. Even assuming I found plaintiff's testimony credible as it relates to this issue, I would find, based upon the body of evidence offered at trial, that such a dispute would be an isolated incident and not symptomatic of hostility or suspicion by DOC towards the NOI.

Based upon Imam Askia's testimony and my observations of both witnesses' demeanor at trial, however, I credit Imam Askia's testimony concerning the inmate representative election. As a former NOI member himself, Imam Askia remains tolerant of all Muslim faiths, including the NOI. Imam Askia testified that an important part of his role as a prison chaplain is to "deal with differences" without getting offended by different beliefs. I do not credit plaintiff's account of their encounter, which described Imam Askia as intolerant and disrespectful. I find that plaintiff's obvious disappointment at not being chosen to serve as inmate representative may have contributed to his somewhat harsh account of their encounter.

Plaintiff also claims that after his dispute with Imam Askia, a group of inmates assigned to security duty in the mosque kept him from attending a Friday *Jumu'ah* service, an act plaintiff believes to have been taken under orders from Imam Askia. Again, I credit the testimony of Imam Askia who testified that in his four-and-a-half years as a facility chaplain, he has never kept anyone from attending Muslim services.

Imam Askia also testified that if he had a security problem in the mosque, he would turn for assistance to the correction officers who are always assigned to provide security during religious services. I find it improbable that a group of inmates would provide organized security at a DOC facility to keep another inmate from attending services as plaintiff claims—particularly in light of the security regularly provided by corrections officers which I observed during a *Jumu'ah* service at a Rikers Island facility.

In sum, because the numerous accommodations and activities offered by DOC did not coerce or pressure plaintiff into committing acts forbidden by his religion or prevent him from engaging in conduct that is mandated by his faith, plaintiff has failed to demonstrate that his exercise of religion has been substantially burdened under RFRA.[42]

B. *Compelling Interest and Least Restrictive Means*

 Even if plaintiff were able to demonstrate that his exercise of religion had been substantially burdened, however, plaintiff would not prevail because DOC has demonstrated that any burden plaintiff might have suffered was in furtherance of a compelling governmental interest and was the least restrictive means of furthering that compelling interest. It is, of course, well established that correction officials have a compelling interest in maintaining internal order in penological institutions, *see Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Campos v. Coughlin,* 854 F.Supp. 194, 207 (S.D.N.Y.1994), and DOC has dem-

---

42. Much evidence was devoted to the question of whether the NOI is a "Muslim" sect. There was a great deal of evidence concerning the beliefs and practices of the NOI and, to a slightly lesser extent, those of "mainstream" or orthodox Muslims.

Plaintiffs urge me to find that the difference in the beliefs held by the NOI and orthodox Islam concerning the divine nature of Fard Muhammad and the role of Elijah Muhammad is analogous "in every relevant respect" to the difference in beliefs (i) held by Catholics and Jews as to the divine nature of Jesus Christ and (ii) held by Protestants and Catholics as to the status of the Pope. (Plaintiffs' Proposed Findings of Fact and Conclusions of Law ("Pl.Proposed Findings") at

¶41.) I decline to adopt these propositions and find that any conclusions on such points are entirely unnecessary.

First, even if I were to adopt plaintiffs' proposed findings, the vast difference in numbers of Catholics, Protestants or Jews and the number of NOI members together with the attendant security and cost concerns discussed above might well mandate the same result I reach today. Second, and more importantly, I have found that plaintiff Muhammad was not substantially burdened in the exercise of his religion while in DOC custody. Under the statute, that is the relevant inquiry, not the inquiry plaintiffs propose into the technical issues of comparative religion.

onstrated (i) the existence of legitimate and compelling logistical, administrative and security concerns underlying its inability to provide the relief sought by plaintiff to the extent not already provided; and (ii) that the current combination of accommodations and programs is the least restrictive means of furthering those concerns. These concerns are interrelated and fundamentally affect the manner in which a dynamic and sprawling correctional system—one that consists mainly of pre-trial detainees, most of whom typically remain in the system for less than two weeks—can be efficiently and safely managed.

As described *supra*, efficient and safe management of a correctional system is a particularly daunting task in New York City because of the increasing number of inmates and the rapid turnover of the inmate population. DOC's mission is made more difficult by its decreasing budget and the resulting reduction in the number of facilities, correction officers and programs. At the same time, DOC is obligated to provide mandated services to its inmate population. The unique situation facing DOC—*i.e.*, a constantly changing and rapidly increasing inmate population yet substantially decreased resources—has a significant bearing on DOC's ability to provide separate religious services for the NOI or any other specific sect or group.

The provision of religious services requires correction officers to search and escort the inmates to services. Many DOC facilities on Rikers Island are flat, one or two story structures requiring inmates to travel along wide, long corridors where they pass other groups of escorted inmates. This requires careful supervision since contraband can be exchanged or altercations can occur when inmates are moving. The congregate services themselves provide additional opportunities for the exchange of contraband among inmates, and thus require additional officers to monitor and search the inmates. In addition, security must be provided in the chapel or mosque area during services. It cannot be reasonably disputed that separate congregate services led by NOI ministers for NOI inmates, as well as any other group activities and/or accommodations, would require additional correction officers.

Finding space and a time slot to offer separate NOI services also poses significant hurdles. The DOC jail system was built for a much smaller inmate population. The evidence indicates there is simply insufficient space and time available for the provision of separate religious services for individual sects or groups in a system already straining to provide the required array of services to an expanding population in disproportionately smaller program areas.

An additional logistical problem is that male Muslim inmates may only be searched by male correction officers. The provision of a second weekly Muslim service where female officers are precluded from conducting searches would cause significant logistical and staffing problems.[43]

In addition to large numbers of inmates who must be gathered and escorted to various activities within each facility, significant numbers of inmates are also moved throughout the system each day due to, for example, changing security classifications, medical reasons and perceived suicide or escape risk. On any given day, numerous inmates are transported to court for appearance, to hospital appointments or specialty clinics located at other facilities.

Finally, there are inherent logistical difficulties arising out of the rapid turnover of inmates. Because of the rapid turnover rate, it would be enormously difficult not only to track the relatively small number of members of the various sects or groups, but also to determine their long-term length of stay. Without being able to predict how long members of particular religious sects or smaller groups will remain in the system, there is no reasonable way to determine whether or not

---

**43.** *But see Rivera v. Smith*, 63 N.Y.2d 501, 483 N.Y.S.2d 187, 193–94, 472 N.E.2d 1015, 1020–21 (1984) (holding that under New York law, intrusion on right of Muslim inmate to free exercise of his religious beliefs by subjecting him to random pat frisk performed by correction officer of opposite sex could not be justified by states in maintaining prison security or in providing equal opportunity for women to serve as prison guards.)

a particular chaplain should be added to service that sect or group or whether additional accommodations should be made. While there might be a significant number of NOI inmates one month, statistically most of them will be out of the system the next month. Even assuming that it would be possible to track the number of NOI inmates and their average length of stay, there is no way to predict where those inmates will be housed within the DOC system consistent with DOC's security classifications.

Furthermore, there has been no credible evidence that there have been more than a few NOI inmates in DOC facilities in the last decade. By contrast, twenty-five percent of DOC inmates identify themselves as Muslim on entry into the system and ten percent identify themselves as "other", that is, not Catholic, Protestant, Jewish or Muslim. (Tr. 758, 762, 778–79).[44] *See Werner v. McCotter,* 49 F.3d 1476, 1481 (10th Cir.) (noting that Native Americans comprise a small percentage of the Utah prison system), *cert. denied,* —— U.S. ——, 115 S.Ct. 2625, 132 L.Ed.2d 866 (1995). Thus, given the small number of NOI members in DOC's population at present and the dynamic nature of the entire population, there is no reasonable way to track the NOI population, just as with any other small sect or group.[45] DOC's response to its particular situation has been to offer generic Catholic, Protestant, Jewish and Muslim congregate services. The individual needs of particular inmates are addressed through private clergy/counsel visits, where an inmate may visit with any member of the clergy willing to visit a DOC facility. Generic services permit DOC to service large groups of inmates in a single space within a facility at a minimal cost, since they require fewer clergy staff and escort and security staff. Generic services also address security concerns by minimizing inmate movement, thus lessening the chances of altercations and exchange of contraband.

Generic services also permit DOC to classify and house inmates based on their security classification rather than their religious affiliation. If inmates were classified by individual religious sects, DOC would have to consider religious affiliation in classifying and housing inmates. This would result in facilities being operated at the highest security level, which is more expensive. DOC is able to avoid this problem by offering generic services.

I find that, given DOC's unique situation, there is no less restrictive alternative DOC could offer in the way of congregate services or classes or congregate holiday services for NOI inmates. Indeed, by accommodating the NOI with separate congregate services, DOC would likely have to accommodate similar sects, such as Shiite, Ah–Mahidiya, Greek Orthodox, Baptist, Orthodox Judaism and so on, thereby exacerbating the difficulties described above. Providing separate services and the various other accommodations sought which are not already available for even a fraction of these individual groups is clearly impossible for a detention system such as DOC for the reasons set forth above.

## II. *First Amendment Claims*

Plaintiffs' second and third causes of action allege, pursuant to 42 U.S.C. § 1983, that the defendants' challenged policy also violates plaintiffs; First Amendment rights to the free exercise of their religion and to be free from any law establishing religion. (Second Am.Compl. ¶¶ 59–63.)

### A. *Free Exercise*

██ Under pre-RFRA First Amendment analysis, regulations alleged to infringe the constitutional rights of inmates are judged under a "reasonableness" test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional

---

**44.** Even plaintiff himself did not represent that he was one of many members of the Nation of Islam at GRVC. He testified that a number of inmates were curious about the Nation of Islam and that he responded to their questions, not that they were members. His request for separate services was an individual request.

**45.** DOC does modify its practices based on its observation of the inmate population. For example, in 1977, DOC added a congregate generic Muslim service because its population had significantly changed and DOC found itself with a large enough pool of inmates to make these services feasible. (Tr. 761–62.)

rights. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987). "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987)). The Supreme Court has explained that:

> In our view, such a standard is necessary if prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations. Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decision-making process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration.

*Turner,* 482 U.S. at 89, 107 S.Ct. at 2261–62 (internal citations and quotations omitted) (other alterations in original).

The vitality of *Turner* and *O'Lone* continues in non-RFRA cases. *E.g., Giano v. Senkowski,* 54 F.3d 1050 (2d Cir.1995) (applying standard to a prisoner's First Amendment challenge to prison policy allowing inmates to possess commercially produced erotic literature but prohibiting possession of nude or semi-nude photographs of spouses or girlfriends). However, there does not appear to be a clear consensus in the courts as to whether RFRA's heightened standard is limited in application to statutory claims brought pursuant to RFRA itself or whether it also applies to constitutional claims brought under the First Amendment. *See Francis v. Keane,* 888 F.Supp. 568, 572 n. 5 (S.D.N.Y.1995) (collecting cases and analyzing RFRA and constitutional claims separately, applying RFRA compelling interest standard to the former and lower First Amendment reasonableness standard to the latter); *see also Alameen v. Coughlin,* 892 F.Supp. 440 (E.D.N.Y.1995) (applying higher standard to RFRA claims and lower standard to First Amendment and Equal Protection claims). Although I find the reasoning of Judge Koetl in *Francis* persuasive, I need not decide this question. As determined *supra,* plaintiffs' statutory RFRA claims fail. Accordingly, even if the RFRA "compelling interest" standard governs plaintiffs' First Amendment claims, plaintiffs' constitutional claims fail for precisely the same reasons.

▬ If, however, the *Turner* and *O'Lone* standard governs plaintiffs' First Amendment claims, plaintiffs' First Amendment claims fail *a fortiori.* As a preliminary matter, I note that the Supreme Court has stated that:

> We do not suggest, of course, that every religious sect or group within a prison— however few in number—must have identical facilities or personnel. A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand. But reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendments without fear of penalty.

*Cruz v. Beto,* 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 1081 n. 2, 31 L.Ed.2d 263 (1972). *See also Woods v. Evatt,* 876 F.Supp. 756, 766 (D.S.C.1995).

When applying the *Turner* standard, a court must consider four factors, *i.e.:*

> 1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest.

*Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.) (citing *Turner,* 482 U.S. at 89–90, 107 S.Ct. at 2261–62), *cert. denied,* 498 U.S. 951, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990); *see also Fromer v. Scully,* 874 F.2d 69, 72 (2d Cir.1989). The Court of Appeals for the Seventh Circuit has explained that:

> [T]he prison must afford all inmates a reasonable opportunity to practice their religion. In providing this opportunity, the efforts of prison administrators, when assessed in their totality, must be evenhanded. Prisons cannot discriminate against a particular religion. The rights of inmates belonging to minority or non-traditional religions must be respected to the same degree as the rights of those belonging to larger and more traditional denominations. Of course, economic and, at time, security constraints may require that the needs of inmates adhering to one faith be accommodated differently from those adhering to another. Nevertheless, the treatment of all inmates must be qualitatively comparable.

*Al–Alamin v. Gramley,* 926 F.2d 680, 686 (7th Cir.1991) (citations omitted).

As extensively discussed *supra,* there can be no question that DOC's policies are rationally related to DOC's legitimate interest in running DOC facilities safely and efficiently. That is, DOC's policies are reasonably related to DOC's concerns that non-generic services and individual group accommodations will undermine DOC's ability to run a complex jail housing some 19,500 highly transitory inmates. Further accommodations—in particular, separate congregate services for NOI inmates—would significantly affect DOC's ability to provide the current level of mandated services to its inmate population. Moreover, if I were to find that DOC must provide separate congregate services for NOI inmates, little, if anything, would preclude numerous other faith groups from seeking their own separate congregate services. The First Amendment surely does not require such an outcome. Also, as explained above, plaintiff as well as any other NOI inmates—to the extent there are such inmates in DOC custody—have adequate opportunity to practice their religion, including access to NOI clergy/volunteers.

## B. *Establishment Clause*

In order to satisfy the Establishment Clause, "a governmental practice must (1) reflect a clearly secular purpose; (2) have a primary effect that neither advances nor inhibits religion; and (3) avoid excessive government entanglement with religion." *Lee v. Weisman,* 505 U.S. 577, 584–85, 112 S.Ct. 2649, 2654, 120 L.Ed.2d 467 (1992) (referring to the test set forth in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)). The Establishment Clause guarantees at a minimum that the government may not "coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so.'" *Id.* at 587, 112 S.Ct. at 2655 (quoting *Lynch v. Donnelly,* 465 U.S. 668, 678, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604 (1984)). The Establishment Clause requires that government programs remain neutral toward religion. *Rosenberger v. Rector and Visitors of the Univ. of Va.,* —— U.S. ——, —— ——, 115 S.Ct. 2510, 2521–22, 132 L.Ed.2d 700 (1995). Furthermore, the "First Amendment forbids an official purpose to disapprove of a particular religion or of religion in general." *Church of The Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, ——, 113 S.Ct. 2217, 2226, 124 L.Ed.2d 472 (1993). The government may neither encourage nor discourage religious practice. For example, the Court of Appeals has upheld a program providing military chaplains where participation was entirely voluntary and soldiers were permitted to choose whether to worship or not without fearing discipline or stigma. *Katcoff v. Marsh,* 755 F.2d 223, 232–33 (2d Cir.1985).

It has long been recognized that providing chaplains in the military and in penal institutions presents a tension between the Establishment Clause and the Free Exercise Clause. *E.g., School Dist. of Abington Township v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) ("*Abington*"); *Theriault v. A Religious Office in the Structure of the Gov't Requiring a Religious Test as a Qualification,* 895 F.2d 104, 105 (2d

Cir.1990); *Monmouth County Correctional Inst'l Inmates v. Lanzaro,* 834 F.2d 326, 341 (3d Cir.1987), *cert. denied,* 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988); *Theriault v. Silber,* 547 F.2d 1279, 1280 (5th Cir.1977). In *Abington,* the Supreme Court noted that, although provisions for chaplains in the military or in penal institutions might contravene the Establishment Clause, they would be sustained as necessary to secure the right to worship guaranteed by the Free Exercise Clause. 374 U.S. at 296–98, 83 S.Ct. at 1610–1611 (Brennan, J., concurring). In prisons, where the government has significant control over inmates' lives, "a niche has necessarily been carved into the establishment clause to require the government to afford opportunities for worship." *United States v. Kahane,* 396 F.Supp. 687, 698 (E.D.N.Y.), *ordered modified by* 527 F.2d 492 (2d Cir.1975). Thus, in the prison context, "the establishment clause has been interpreted in the light of the affirmative demands of the free exercise clause." *Kahane,* 396 F.Supp. at 698.

The majority of cases dealing with the First Amendment rights of prisoners appear to be Free Exercise, not Establishment, cases. However, at least one court has held that " 'the mere fact that a prison chaplain is of one particular faith' does not constitute an Establishment Clause violation." *Ingram v. Ault,* 50 F.3d 898, 900 (11th Cir.1995) (quoting the decision of the district court below). *See also Johnson–Bey v. Lane,* 863 F.2d 1308, 1312 (7th Cir.1988) (stating that "[p]risons are entitled to employ chaplains and need not employ chaplains of each and every faith to which prisoners might happen to subscribe, but may not discriminate against minority faiths except to the extent required by the exigencies of prison administration").[46]

▮▮▮ In the instant action, plaintiffs argue that the City defendants' conduct (i) in decid-

ing to which religions they will provide religious services and accommodations and to which they will not and (ii) in denying religious services and accommodations to followers of the NOI while allowing the same rights to inmates who adhere to other religions does not reflect a clearly secular purpose. First, I do not agree with plaintiffs' characterization of the facts. That is, I have already found that DOCS did not substantially burden plaintiff Muhammad's free exercise, and plaintiffs' blanket assertion that religious services and accommodations have been "denied" to NOI inmates is simply wrong and wholly without support in the record. Second, I find that DOC's policies do reflect a permissible purpose, *i.e.,* providing religious accommodations to the inmates in its custody while operating within the difficult constraints of the economic and security concerns described *supra.*

Plaintiffs also argue that the City defendants' conduct has a primary effect that advances certain religions and inhibits the NOI religion. I disagree. First, I find that plaintiffs have not demonstrated that NOI inmates are inhibited in the practice of their religion. Second, the primary effect is to allocate DOC's limited resources equitably in order to provide spiritual guidance for all DOC inmates, not to advance any one or more religious groups.

Finally, I reject plaintiffs' argument that the City defendants' conduct entangles government excessively with religion. In order to permit inmates to freely exercise their religion, *some* entanglement is necessary. *Kahane,* 396 F.Supp. at 698. I find that DOC's activities in accommodating inmates' free exercise rights do not result in an excessive entanglement with religion. I note, for example, that as to clergy/counsel visits and literature, DOC's only inquiry is based on its

---

**46.** *But cf. Thompson v. Commonwealth of Ky.,* 712 F.2d 1078 (6th Cir.1983). In *Thompson,* the Court of Appeals for the Sixth Circuit noted that the question whether the state of Kentucky had "imposed the Baptist denomination of the Christian religion on the inmates at the LaGrange Reformatory by hiring only Baptist ministers and [had] thereby violated the Establishment Clause" was one which leads "into a difficult area" and explicitly declined to address it. *Id.* at 1080.

However, Judge Jones, in his dissent, argued that "when a state prison institution allocates religious facilities in an unevenhanded manner, a threshold establishment problem is presented" and that "the mere fact that the Muslim inmates have not been denied the opportunity to practice their religion does not mean that no First Amendment violation has occurred." *Id.* at 1083 (Jones, J., dissenting).

security concerns. As to congregate services, DOC's only concerns are those governed by inmate numbers, security and funding—all of which are legitimate, indeed, compelling concerns and none of which result in excessive entanglement with religion.

In sum, I find that DOC has allocated its resources among the various religious groups in an even-handed manner that does not contravene the Establishment Clause.

## III. *Equal Protection*

 In their fourth cause of action, plaintiffs allege, pursuant to 42 U.S.C. § 1983, that DOC's religious accommodation policies violate their right to equal protection. (Second Am.Compl. ¶¶ 64–65.) Prior to the enactment of RFRA, the Court of Appeals applied the *Turner* and *O'Lone* standard to equal protection claims of prisoners. The Court stated that, with respect to such claims, "the reasonableness of the prison rules and policies must be examined to determine whether distinctions made between religious groups in prison are reasonably related to legitimate penological interests." *Benjamin v. Coughlin,* 905 F.2d 571, 575 (2d Cir.), *cert. denied,* 498 U.S. 951, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990). *See also Weir v. Nix,* 890 F.Supp. 769, 785 (S.D.Iowa 1995) (stating that, to the extent a prisoner's equal protection claims are based on religious classification, the compelling interest governs his claims, and the reasonableness test applies to his remaining claims); *Alameen v. Coughlin,* 892 F.Supp. 440, 451 (E.D.N.Y.1995) (applying reasonableness test); *Campos v. Coughlin,* 854 F.Supp. 194, 213 (S.D.N.Y.1994) (declining to decide whether the *Turner/O'Lone* standard survives the enactment of RFRA in equal protection claims because plaintiffs were able to satisfy the less rigorous reasonableness test); *Griffin v. Coughlin,* 743 F.Supp. 1006, 1010–11 (N.D.N.Y.1990). I need not determine whether the *O'Lone/Tur-*

*ner* standard applies to equal protection claims because defendants prevail regardless of whether the compelling interest standard set forth in RFRA discussed *supra* or the *O'Lone/Turner* standard applies.

As to the latter standard, as described *supra,* DOC's policies are reasonably related to legitimate penological interests in being able to manage effectively the large number of rapidly changing inmates in the DOC system and in maintaining security and good order. In addition, all faith groups receive generic religious services, with unlimited individual clergy/counsel visits and a flexible individual accommodation policy. I find that NOI inmates are not being treated differently from other inmates and, to the extent they might be, such differences are rationally related to legitimate penological interests.

## IV. *New York Law*

### A. *State law*

Plaintiffs allege in their fifth cause of action that the City defendants' religious accommodation policies violate the Constitution and laws of New York. (Second Am.Compl. ¶¶ 66–68, 71.) The New York Constitution provides in pertinent part that:

> The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all mankind; and no person shall be rendered incompetent to be a witness on account of his opinions on matters of religious belief; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this state.

N.Y. Const., art. 1, § 3. This free exercise right has been extended to inmates in New York correctional facilities by New York Correction Law § 610.[47] *Rivera v. Smith,* 63

---

47. Correction Law § 610 states in pertinent part that:

 1. All persons who may have been or may hereafter be committed to or taken charge of by any of the institutions mentioned in this section, are hereby declared to be and entitled to the free exercise and enjoyment of religious

profession and worship, without discrimination or preference.
 2. This section shall be deemed to apply to every incorporated or unincorporated society for the reformation of its inmates, as well as houses of refuge, penitentiaries, protectories, reformatories or other correctional institutions....

N.Y.2d 501, 483 N.Y.S.2d 187, 191–92, 472 N.E.2d 1015, 1018–20 (1984). The New York Court of Appeals has held that:

> The standard for assessing the validity of prison regulations that infringe on inmates' constitutional rights has been articulated by the Supreme Court as follows: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." ... Similarly, a State constitutional challenge to prison regulations requires a balancing of the competing interests at stake: the importance of the right asserted and the extent of the infringement are weighed against the institutional needs and objectives being promoted. Finally, in reaching the appropriate balance of factors under either the Federal or State approach, a measure of judicial deference is to be accorded the judgment of correction officials.

*Lucas v. Scully*, 71 N.Y.2d 399, 526 N.Y.S.2d 927, 930, 521 N.E.2d 1070, 1073 (1988) (quoting *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987)) (other citations omitted). *See also Jackson v. Coughlin*, 204 A.D.2d 939, 612 N.Y.S.2d 89, 90 (3d Dep't 1994); *Bunny v. Coughlin*, 187 A.D.2d 119, 593 N.Y.S.2d 354, 356–57 (3d Dep't 1993).

▮▮▮▮ Under New York law, "freedom of exercise of religious worship is not an absolute but rather a preferred right; it 'cannot interfere with the laws which the State enacts for its preservation, safety or welfare.'" *Brown v. McGinnis*, 10 N.Y.2d 531, 225 N.Y.S.2d 497, 500, 180 N.E.2d 791, 793 (1962) (citing *People ex rel. Fish v. Sandstrom*, 279 N.Y. 523, 530, 18 N.E.2d 840 (1939)). That is, New York law "confers upon prison inmates the right to religious services, spiritual advice and ministration from some recognized clergyman"; however, § 610 also "expressly authorizes the reasonable curtailment of such rights if such is necessary for the 'proper discipline and management of the institution.'" *Id.* (citing § 610). The New York Court of Appeals more recently has stated that "[n]otwithstanding the importance of this right, it does not prevent the imposition of reasonable restrictions by prison officials, but rather such restrictions must be weighed against the institutional needs and objectives being promoted." *Rivera*, 483 N.Y.S.2d at 192, 472 N.E.2d at 1020 (citations omitted). Prisoners do not have the free exercise rights they might outside the prison walls. *Id.* (stating that "[t]he nature of a correctional facility, where confinement and order are necessary, is such that inmates cannot be afforded free exercise rights as broad as those enjoyed outside the prison setting"). Budgetary and administrative concerns may outweigh a desired religious accommodation. *Bunny*, 593 N.Y.S.2d at 357–58 (affirming decision that Rastafarian inmate's right to consume a particular diet was outweighed by legitimate penological interest of the Department of Corrections, *i.e.*, budgetary and administrative concerns).

▮▮▮▮ As discussed above, DOC's religious accommodation policies are based on legitimate institutional needs and objectives. The religious rights the plaintiff seeks to exercise are important; nonetheless, his rights are infringed upon, if at all, only slightly, and DOC's institutional needs and objectives are significant, as described *supra*. Accordingly,

---

3. The rules and regulations established for the government of the institutions mentioned in this section shall recognize the right of the inmates to the free exercise of their religious belief, and to worship God according to the dictates of their consciences ... in such manner as may best carry into effect the spirit and intent of this section and be consistent with the proper discipline and management of the institution; and the inmates of such institutions shall be allowed such religious services and spiritual advice and spiritual ministration from some recognized clergyman of the denomination or church which said inmates may respectively prefer or to which they may have belonged prior to their being confined in such institutions; ... such services to be held and such advice and ministration to be given within the building or grounds, whenever possible, where the inmates are required by law to be confined, in such manner and at such hours as will be in harmony, as aforesaid, with the discipline and the rules and regulations of the institution and secure to such inmates free exercise of their religious beliefs in accordance with the provisions of this section. N.Y.Correct.Law § 610 (McKinney 1987).

DOC's conduct is proper under the Constitution and laws of New York.

### B. *City Regulations*

■ Plaintiffs allege that defendants' conduct violates the Rules of the City of New York. (Second Am.Compl. ¶¶ 69–71.) The New York City Board of Corrections is an independent City agency, created pursuant to Section 626 of the City Charter, whose purpose is, among other things to "establish minimum standards for the care, custody, correction, treatment, supervision, and discipline" of persons in city custody. *See* N.Y. City Charter § 626(e). The Board of Corrections has promulgated Minimum Standards for correctional facilities, which are codified in Title 40, Rules of the City of New York, Chapter 1.[48] These regulations have been incorporated into DOC's operating procedures, in Directive 3252, "Congregate Religious Services." (Pl.Ex. 30; Tr. 746.)

The Minimum Standards require only that inmates "be permitted" to congregate for the purpose of religious activities. It does not mandate a policy institutionalizing congregate activities if there is no institutional de-

mand for those activities. The evidence adduced at trial demonstrates no systematic demand for NOI congregate activities. Indeed, plaintiff Muhammad, the only plaintiff asserting claims against DOC, did not testify that he requested such institution-wide activities. When requested to provide congregate religious activities in the past, DOC has accommodated inmates, as in the case with the Buddhist inmates. This was the only group request made to the DOC Director of Ministerial Services during his tenure.

In short, the evidence at trial did not indicate that DOC has violated city regulations.

### V. *Qualified Immunity*

■ Defendants Anthony Schembri, Allyn Sielaff and Catherine Abate (the "individual City defendants") are former DOC commissioners. Plaintiffs assert that each of the individual City defendants held the position of Commissioner at times relevant to the allegations made in the Second Amended Complaint. The individual City defendant assert that (i) they are not sued in their

---

**48.** These rules provide in pertinent part that:

§ 1–08 Religion. (a) Policy. Prisoners have an unrestricted right to hold any religious belief, and to be a member of any religious group or organization, as well as refrain from the exercise of any religious beliefs. A prisoner may change his or her religious affiliation. (b) Exercise of religious beliefs. (1) Prisoners are entitled to exercise their religious beliefs in any manner that does not constitute a clear and present danger to the safety or security of an institution. (2) No employee or agent of the Department or of any voluntary program shall be permitted to proselytize or seek to convert any prisoner, nor shall any prisoner be compelled to exercise or dissuaded from exercising any religious belief. (3) Equal status and protection shall be afforded all prisoners in the exercise of their religious beliefs except when such exercise is unduly disruptive of institutional routine. (c) Congregate religious activities. (1) Consistent with the requirements of § 1–08(a), all prisoners shall be permitted to congregate for the purpose of religious worship and other religious activities. (2) Each institution shall provide all prisoners access to an appropriate area for congregate religious worship and other religious activities. Consistent with the requirements of § 1–08(b)(1), this area shall be made available to

prisoners in accordance with the practice of their religion. (d) Religious advisors. (1) As used in this Section the term "religious advisor" shall mean a person who has received ecclesiastical endorsement from the relevant religious authority. (2) Religious advisors shall be permitted to conduct congregate religious activities permitted pursuant to § 1–08(c). When no religious advisor is available, a member of a prisoner religious group may be permitted to conduct congregate religious activities.

\* \* \* \* \* \*

(e) Celebration of religious holidays or festivals. Consistent with the requirements of § 1–08(b)(1), prisoners shall be permitted to celebrate religious holidays or festivals on an individual or congregate basis. (f) Religious dietary laws. Prisoners are entitled to the reasonable observance of dietary laws or fasts established by their religion. Each institution shall provide prisoners with food items sufficient to meet such religious dietary laws. (g) Religious articles. Consistent with the requirements of § 1–08(b)(1), prisoners shall be entitled to wear and to possess religious medals or other religious articles, including clothing and hats. (Rules of the City of New York, Title 40, Ch. 1, § 1–08.)

individual capacities, and thus face no personal liability and (ii) even were they sued in their individual capacities, they would be protected by the doctrine of qualified immunity.

In *Harlow v. Fitzgerald,* the Supreme Court described the application of summary judgment in a § 1983 action as follows:

> [G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. . . . On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified an unlawful. . . . If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.

457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (footnotes and citations omitted). *See, e.g., Rivera v. Senkowski,* 62 F.3d 80, 83 (2d Cir.1995); *Piesco v. City of New York, Dep't of Personnel,* 933 F.2d 1149, 1160 (2d Cir.), *cert. denied,* 502 U.S. 921, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991); *Kaminsky v. Rosenblum,* 737 F.Supp. 1309, 1318 (S.D.N.Y.1990).

In this case, plaintiffs primarily rely on RFRA, a statute passed in 1993, which has retroactive application. Plaintiff Muhammad, the only plaintiff asserting claims against the City, was held in City custody in the period 1989–1991. (Tr. 286.) Since the case law on RFRA only began to develop after plaintiff Muhammad's incarceration— and since the original complaint was filed about a year prior to the passage of RFRA— the individual defendants could not reasonably have been expected to surmise that their alleged conduct violated this new statute. This is particularly so since the legislative history specifically eschews imposing a standard that would "exacerbate the difficult and complex challenges of operating the Nation's prisons and jails in a safe manner." S.Rep. No. 103–111, 103rd Cong., 1st Sess., *reprinted in* 1993 U.S.C.C.A.N. pp. 1892, 1899–1900.

In *Woods v. Evatt,* the District Court found that prison officials were entitled to qualified immunity for acts taken prior to the passage of RFRA:

> The RFRA was clearly a change in the law and was a clear and determined break from the interpretation of that law by the Supreme Court and the appellate courts. As its legislative history makes clear, the law was intended to change the standard under which claims of religious freedoms and/or discrimination were considered. 42 U.S.C. § 2000bb(b)(1) stated that the law was intended "to restore the compelling interest test" set forth in cases decided by the U.S. Supreme Court in 1963 and 1972. At the time of most of the actions taken in this case, the defendants were all acting under the former "standard" of *O'Lone v. Estate of Shabazz* and other related cases. Their conduct could not have violated "clearly established statutory or constitutional right" since the RFRA had not yet been passed. They would, therefore, be entitled to qualified immunity for any actions they took or decisions they made prior to the enactment of the RFRA.

876 F.Supp. 756, 771–72 (D.S.C.1995). The Court in *Woods* also noted that immunity would extend only to actions taken prior to the effective date of RFRA. *Id.* at 772 n. 18. Other courts have recognized qualified immunity as a defense to RFRA actions brought by prisoners. *E.g., Werner v. McCotter,* 49 F.3d 1476, 1481 (10th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2625, 132 L.Ed.2d 866 (1995); *Abordo v. Hawaii,* 902 F.Supp. 1220, 1228–30 (D.Haw.1995); *Muslim v. Frame,* 897 F.Supp. 215, 220–21 (E.D.Pa.1995); *Hall v. Griego,* 896 F.Supp. 1043, 1049 (D.Colo. 1995); *Rust v. Clarke,* 851 F.Supp. 377, 381 (D.Neb.1994).

Moreover, even had plaintiff Muhammad been in City custody following the passage of RFRA, the individual defendants

would still be entitled to qualified immunity. Up until the time of trial, the Court of Appeals for the Second Circuit had not had occasion to construe the statute, and only a handful of district court judges in the Southern and Eastern Districts had issued RFRA opinions. *See Hall,* 896 F.Supp. at 1049 (finding that defendants were entitled to qualified immunity for transfer and reclassification of a prisoner that occurred after enactment of RFRA because, at the time, there were no Supreme Court or Tenth Circuit decisions "defining the contours of prisoners' rights under the RFRA, nor was there clearly established weight of authority from other courts that could be said to have put defendants on notice regarding the wrongfulness of their conduct"). Indeed, a number of other courts had cast doubts on the constitutionality of the statute. *E.g., Canedy v. Boardman,* 16 F.3d 183, 186 n. 2 (7th Cir. 1994). Therefore, the law cannot be said to have been clearly established at the time of the incidents underlying this action, and thus the former commissioners would be protected under the doctrine of qualified immunity.

### CONCLUSION

The above constitutes my findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. In sum, I find that the plaintiffs have not demonstrated any violation of their constitutional and statutory rights by the City defendants. Even if such a violation occurred, the individual City defendants would be entitled to the defense of qualified immunity. Judgment shall be entered accordingly.